In re Andrew HYMAN, Debtor.

G. Hallett Denton, as Executor of
the Estate of George W.
Denton, Plaintiff,

v.

Andrew A. Hyman, Defendant.

Bankruptcy No. 03 B 22150(ASH).
Adversary No. 04–08536A(ASH).

United States Bankruptcy Court,
S.D. New York.

Jan. 21, 2005.

M. Stuart Goldberg, LLC, by M. Stuart Goldberg, White Plains, NY, for Debtor/Defendant.

Meyers Tersigni Feldman & Gray LLP, by Anthony Torsini, New York City, Co–Counsel for Debtor/Defendant.

Greenfield Stein & Senior, LLP, by Kenneth L. Stein, New York City, for Plaintiff.

Sanford P. Rosen & Associates, P.C., by Kenneth M. Lewis, New York City, Co–Counsel for Plaintiff.

***SUPERCEDING DECISION DISMISSING CLAIMS BASED ON COLLATERAL ESTOPPEL FOR NON-DISCHARGEABILITY UNDER SECTION 523(a)(2), (4) AND (6) OF THE BANKRUPTCY CODE***

ADLAI S. HARDIN, JR., Bankruptcy Judge.

Plaintiff G. Hallett Denton, as Executor of the Estate of George W. Denton ("plaintiff," the "Executor" or the "Estate") obtained a pre-petition judgment in the Westchester County Surrogate's Court against defendant/debtor Andrew Hyman (the "debtor" or "Hyman") in the amount of approximately $2.7 million. After Hyman filed for bankruptcy in this Court, plaintiff timely commenced this adversary proceeding seeking (i) an order fixing and allowing the Estate's claim in the debtor's bankruptcy case in the amount of the Surrogate's Court Judgment and (ii) an order and judgment declaring that plaintiff's claim is excepted from the debtor's discharge pursuant to Sections 523(a)(2), (4) and (6) of the Bankruptcy Code.

Plaintiff and the debtor each filed a motion and cross-motion seeking summary judgment. At a final hearing on the cross-motions on November 15, 2004, the Court rendered an oral decision granting in part and denying in part both motions and, following the oral decision, the Court established a schedule of further proceedings leading to a trial on the merits of plaintiff's claim under Section 523(a)(4).

Plaintiff's motion for summary judgment is based on the supposed collateral estoppel effect of the findings of fact and conclusions of law rendered after trial in a written decision by the Surrogate's Court as the predicate for the Surrogate's Court

Judgment. In the oral ruling at the November 15, 2004 hearing, this Court concluded that neither the allegations of the complaint nor the Surrogate's Court Decision set forth any factual grounds for a declaration of non-dischargeability under Section 523(a)(2) or (6) of the Bankruptcy Code. On plaintiff's claim under Section 523(a)(4), this Court ruled that because the legal standards for *non-dischargeability* under the Bankruptcy Code are not the same as the state law requirements for *liability,* the findings and conclusions expressed by the Surrogate's Court could not be given preclusive effect as to the materially different legal issues arising under the Bankruptcy Code. Accordingly, both plaintiff and the debtor are entitled to an opportunity to present evidence at a trial necessary to establish, and defend against, plaintiff's claim of non-dischargeability under Section 523(a)(4).

At the November 15 hearing, counsel stated that plaintiff would not rely exclusively on the doctrine of collateral estoppel but would seek an opportunity to establish the facts necessary to support his claim at a trial. Since the November 15 ruling was interlocutory, and since plaintiff's counsel did not fully address the bankruptcy issues framed by the Court during briefing or oral arguments on the motion for summary judgment, the Court established a briefing schedule on the legal issues and did not include in the November 15 oral ruling citation or discussion of the governing legal authorities.

Plaintiff has now moved to withdraw its claims of non-dischargeability under Section 523(a) other than as may be established by the Surrogate's Court Decision under the doctrine of collateral estoppel, thereby withdrawing and waiving the Estate's right to present evidence at a trial or further argument on the law in support of such claims. Consequently, the Court's

November 15 oral ruling and the November 29 order based upon it, which were interlocutory pending further briefing and a trial on the merits, may now be superceded by a final decision and order.

The Court issues this Superceding Decision amplifying the November 15 oral ruling by citation to and analysis of the governing legal authorities, as a basis for a final, and appealable, order concluding this adversary proceeding.

### *Jurisdiction*

This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(a) and 157(a) and the standing order of referral to Bankruptcy Judges signed by Acting Chief Judge Robert J. Ward on July 10, 1984. It is a core proceeding under 28 U.S.C. Section 157(b).

### *Background*

For purposes of the parties' cross-motions for summary judgment, the facts may be briefly summarized based upon the parties' statements of facts and the Surrogate's Court Decision.

In 1984 Hyman and decedent George W. Denton ("Denton") went to work for an insurance agency formed by one Henry Deppe. Deppe's agency was the general agent in Westchester County of the Guardian Life Insurance Company of America ("Guardian"). Deppe's agency for many years had marketed insurance through pension plans. For this purpose Deppe had formed a separate company to design and administer pension plans called National Pension Services, Inc. The pension business never made a profit but acted as a feeder for the insurance agency, which generated substantial income.

By late 1987 Deppe was ready to retire, and he entered into an agreement to sell his business to Denton and Hyman.

Guardian approved both Denton and Hyman together as Guardian's agent for Westchester County under an agreement providing that if either left the business their agency relationship with Guardian would terminate.

Denton and Hyman formed their own agency, the Denton Hyman Agency, and their own pension firm, also called National Pension Services, Inc. ("NPS"). The various agreements were executed on or about January 1, 1988, and Denton and Hyman at that time commenced their business.

The precise terms of the agreements are not relevant here. The bottom line was that Denton and Hyman took over Deppe's business and began their own business as Guardian agents with start-up debts of over $1.6 million owed by the Denton Hyman Agency and NPS, which were personally guaranteed by Denton and by Hyman jointly and severally.

Denton and Hyman each owned fifty percent of the capital stock of the Denton Hyman Agency and of NPS, as well as another company called NPA, which apparently was not a significant economic factor based on the record before me.

As was the case when operated by Deppe, the Denton Hyman Agency generated the profits while the pension business, NPS, acted as a generator or feeder of business for the insurance agency but did not make any money itself. In fact, NPS was always operated at a loss by Deppe, Denton and Hyman, and later by Hyman alone.

Unfortunately, George Denton, who was older and more experienced in the insurance business than Hyman, died suddenly and unexpectedly on February 14, 1989, only thirteen months after Denton and Hyman started their business together.[1] Also unfortunately, Denton and Hyman had no shareholder's agreement or a similar agreement providing for a buyout of the other or what would happen to the business or to the rights and obligations of the shareholders if one died or otherwise left the business.

Several hard facts were quite clear, however. One was that the agency relationship between the Guardian and the Denton Hyman Agency was automatically terminated upon Denton's death. Thus, the Denton Hyman Agency was finished except to pay its debts and collect the residual or override commissions it had earned in the thirteen months of its existence. It had no other material assets. To quote the Surrogate's Court:

> the agency agreement and Guardian policy automatically terminated the relationship between Denton–Hyman and the Guardian on Denton's death, and precluded the Denton estate or Denton–Hyman from becoming a shareholder in the new general agency.

The second hard fact was that Denton's estate and Hyman each were jointly and severally liable for over $1.6 million in debts for which the only source of repayment had been the Denton Hyman Agency relationship with Guardian, which was terminated by Denton's death.

After Denton's death, Guardian accepted Hyman alone as its insurance agent in Westchester, and Hyman formed the Andrew A. Hyman Agency ("Hyman Agency") to serve as Guardian's agent. Hyman continued to operate NPS, which did not automatically terminate as operated by Denton and Hyman, and to fund its deficit

---

1. G. Hallett Denton, a lawyer and George Denton's son, was appointed Executor of his father's estate.

operations to serve as a feeder for the Hyman Agency. Hyman formed and operated the Hyman Agency and continued to operate NPS with the full knowledge and acquiescence of the Executor.

Hyman's insurance agency relationship with Guardian terminated in January of 1994 for reasons which are not in the record before me.

The entire $1.6 million debt of the Denton Hyman Agency and NPS was paid off by Hyman, apparently using residual commissions earned by the Denton Hyman Agency in its thirteen months of operation and earnings of the Hyman Agency.

Hyman engaged in lengthy negotiations with the Executor until shortly after termination of Hyman's agency agreement with Guardian regarding a purchase of the Estate's fifty percent interest in the defunct Denton Hyman Agency, NPS and NPA. Both sides were advised in these negotiations by competent professionals. The negotiations did not result in any agreement, and failure of those negotiations led to the Surrogate's Court proceeding brought by the Executor against Hyman.

In March 1994, the Executor commenced the proceeding in the Surrogate's Court that resulted in the post-trial decision by the Surrogate's Court in December 2002 and subsequent judgment in favor of the Executor against Hyman. Actually, the judgment requires Hyman to pay the $2.7 million not to the Estate but to the Denton Hyman Agency and, according to the Surrogate's Court Decision, the judgment is recompense to the Denton Hyman Agency for profits earned by Andrew Hyman's Agency after George Denton's death.

Unable to pay the judgment, Hyman filed this case under Chapter 11 of the Bankruptcy Code in 2003. The Surrogate's Court judgment was affirmed by the Appellate Division in early 2004. The New York Court of Appeals has rejected an appeal as unripe. This case was converted to Chapter 7 in July 2004 after the Appellate Division affirmed the Surrogate's Court.

### *Discussion*

### I. *Enforcement of the Surrogate's Court Judgment*

■ The Executor has filed a claim in Hyman's bankruptcy case in the amount of the Surrogate's Court Judgment. As plaintiff in this adversary proceeding, the Executor has asserted in the "Second Claim for Relief" that the Executor is "entitled to the entry of an order fixing and allowing his claim in the amount of $2,734,832.04, plus such other amounts to be allowed by the Surrogate's Court as set forth above."

Plaintiff's Second Claim for Relief is well founded. This Court does not sit as a reviewing court to examine into the merits of the Surrogate's Court Decision and Judgment. Unless it is upset on appeal, the Surrogate's Court Judgment will be given full force and effect and will be allowed in full as an enforceable claim against the assets of the debtor's estate. The Surrogate's Court analysis of state law, its findings of fact and its ultimate conclusions in applying state law to the facts to determine liability and damages cannot and will not be re-examined or even considered by this Court.

The Surrogate's Court Judgment is entitled to and will be accorded full faith and credit by this Court and will be allowed in full as a claim in this case entitled to receive its *pro rata* share of the assets in the debtor's bankruptcy estate.

The task of this Court in this adversary proceeding is not to determine the debtor's liability under state law, as the Surrogate's

Court did, but to determine whether the debtor's right to a discharge under the Bankruptcy Code should be denied as a matter of federal law. As amplified below, the issues before this Court are quite different from those which the Surrogate's Court had before it.

Nothing in this decision on dischargeability under federal law may be construed as a comment on the validity or appropriateness under state law of the Surrogate's Court decision. The Surrogate's Court Judgment will be treated as valid and will be enforced as the Executor's allowed claim in this bankruptcy case.

## II. *Dischargeability of the Executor's Allowed Claim*

After setting forth the background facts including the Surrogate's Court Decision in December 2002 and subsequent judgment entered in April 2003, the complaint in this adversary proceeding alleges in the First Claim for Relief (paragraph 22) that the debtor "is collaterally estopped from contesting [the Surrogate's] findings of fact and conclusions of law" and requests a declaration that plaintiff's claim be excepted from the debtor's discharge pursuant to Sections 523(a)(2), (4) and (6) of the Bankruptcy Code. The Third, Fourth and Fifth Claims for Relief seek declarations of nondischargeability under subsections (2), (4) and (6), respectively, of Section 523(a) on the facts alleged without relying on the collateral estoppel effect of the Surrogate's Court Decision. Since plaintiff has now either abandoned or withdrawn the Estate's claims under the Third, Fourth and Fifth Claims for Relief, plaintiff relies solely on the purported collateral estoppel effect of the Surrogate's Court Decision in seeking to hold the Executor's claim nondischargeable.

## A. *Collateral estoppel in bankruptcy proceedings*

■ There is no doubt that the doctrine of collateral estoppel applies in bankruptcy proceedings generally and in proceedings arising under Section 523(a) of the Bankruptcy Code in particular. *Grogan v. Garner*, 498 U.S. 279, 284 n. 11, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) ("[C]ollateral estoppel principles do indeed apply in discharge exception proceedings pursuant to § 523(a)"); *In re DeTrano*, 326 F.3d 319, 322 (2d Cir.2003) ("Where the debt in question is a judgment entered after a claim of fraud has been adjudicated, either party to a subsequent adversary proceeding on nondischargeability can invoke collateral estoppel to establish that the debt is or is not dischargeable under the relevant nondischargeability provision." (citing *Grogan v. Garner*, 498 U.S. 279, 285–91, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991))); *Zois v. Cooper*, 268 B.R. 890, 893 (S.D.N.Y. 2001), *aff'd*, 73 Fed.Appx. 509 (2d Cir.2003) ("Collateral estoppel applies in Section 523(a) discharge exception proceedings." (citations omitted)); *see also Perino v. Cohen (In re Cohen)*, 92 B.R. 54, 60 (Bankr. S.D.N.Y.1988) ("In the Second Circuit, the bankruptcy courts have 'uniformly applied' the doctrine of collateral estoppel to dischargeability proceedings." (citations omitted)); *In re Scheller*, 265 B.R. 39, 57 (Bankr.S.D.N.Y.2001) ("The Supreme Court has held that collateral estoppel principles apply in proceedings under Section 523(a).") (citing *Grogan v. Garner*, 498 U.S. 279, 284, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)); *In re Krautheimer*, 210 B.R. 37, 49 (Bankr.S.D.N.Y.1997) ("This question was formally answered in *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), where the Supreme Court definitively held that collateral estoppel does apply to Section 523(a) matters. *Id.* at 284–285 n. 11, 111 S.Ct. at 658 n. 11.").

■ For purposes of the decision in this case, the rule is firmly established by countless federal court decisions that preclusion under collateral estoppel applies only when three conditions are fulfilled: (1) the issue to be decided by this Court must be *identical* to the issue decided by the Surrogate's Court; (2) the identical issue must have been *actually litigated* in the Surrogate's Court; and (3) the issue must have been *actually determined* by the Surrogate's Court Decision and Judgment. *Conte v. Justice*, 996 F.2d 1398, 1400 (2d Cir.1993) ("Initially, the court must determine whether the issue sought to be litigated is identical to an issue necessarily decided in the prior action and decisive on the present action. (citation omitted) Upon satisfaction of the issue identity requirement, inquiry turns toward whether the party to be bound had a full and fair opportunity to contest the determination now said to control." (citation omitted)). To the same effect, *State of New York v. Sokol (In re Sokol)*, 113 F.3d 303, 306 (2d Cir.1997) ("... New York law provides that the party seeking the benefit of collateral estoppel ... has the burden of demonstrating the identity of the issues and the necessity of their having been decided, and the party opposing its use ... has the responsive burden of establishing the absence of a full and fair opportunity to litigate the issue in the prior action." (citing *Kaufman v. Eli Lilly and Co.*, 65 N.Y.2d 449, 455–56, 492 N.Y.S.2d 584, 588, 482 N.E.2d 63, 67 (1985) and *Ryan v. New York Tel. Co.*, 62 N.Y.2d 494, 501, 478 N.Y.S.2d 823, 827, 467 N.E.2d 487, 491 (1984))); *Grogan v. Garner*, 498 U.S. at 284–85, 111 S.Ct. 654 ("... a bankruptcy court could properly give collateral estoppel effect to those elements of the claim that are identical to the elements required for discharge and which were actually litigated and determined in the prior action." (citing Restatement (Second) of Judg-ments § 27 (1982))); *Mishkin v. Ensming-er (In re Adler, Coleman Clearing Corp.)*, 218 B.R. 689, 698 (Bankr.S.D.N.Y.1998) ("Collateral estoppel precludes relitigation of an issue previously litigated by the parties in federal court if: (1) the issues in both proceedings are identical; (2) the issue in the prior proceeding was actually litigated and actually decided; (3) there was a full and fair opportunity for litigation in the prior proceeding; and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits." (citing *Interoceanica Corp. v. Sound Pilots, Inc.*, 107 F.3d 86, 91 (2d Cir.1997)) and *Levy v. Kosher Overseers Ass'n of America, Inc.*, 104 F.3d 38, 41 (2d Cir.1997)); *Zohlman v. Zoldan (In re Zoldan)*, 226 B.R. 767, 771 n. 5 (S.D.N.Y.1998) ("The complete, four-part test to establish whether collateral estoppel applies to a prior court's findings is as follows:

(1) The issue sought to be precluded must be identical to that involved in the prior action;

(2) The issue must be actually litigated and actually decided;

(3) There must have been a full and fair opportunity for litigation in the prior proceeding; and

(4) The issue previously decided must have been necessary to support a valid and final judgment on the merits. *See, e.g., Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 44 (2d Cir. 1986), *cert. denied*, 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 794 (1987).").

Although Hyman claims that a further appeal may be possible to the New York Court of Appeals, for purposes of this decision the Surrogate's Court Decision and Judgment are treated as valid and final.

■ The question, then, is whether the issues to be decided in this proceeding under Section 523(a)(4) of the Bankruptcy

Code are identical to the issues decided by the Surrogate's Court. As will be shown below, the answer to that question is that the issues are not identical, and therefore the rulings of the Surrogate's Court under state law are not preclusive or determinative of the issues that must be decided as a predicate for denial of Hyman's discharge under Section 523(a)(4).

**B. *Some general observations on the discharge in bankruptcy***

It is quite safe to say that the discharge provided under the four operative segments of the Bankruptcy Code, Chapters 7, 11, 12 and 13, lies at the very heart of the Bankruptcy Code. The so-called "fresh start" provided by the discharge is central to the social policy underlying the bankruptcy laws in this country since the 19th century. *See Wetmore v. Markoe*, 196 U.S. 68, 76, 25 S.Ct. 172, 176, 49 L.Ed. 390 (1904) ("Systems of bankruptcy are designed to relieve the honest debtor from the weight of indebtedness which has become oppressive, and to permit him to have a fresh start in business or commercial life, freed from the obligation and responsibilities which may have resulted from business misfortunes"); *Local Loan Co. v. Hunt*, 292 U.S. 234, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934) ("One of the primary purposes of the Bankruptcy Act is to 'relieve the honest debtor from the weight of oppressive indebtedness, and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes.'" (quoting *Williams v. U.S. Fidelity & Guaranty Co.*, 236 U.S. 549, 554, 555, 35 S.Ct. 289, 290, 59 L.Ed. 713 (1915))). Congress reiterated this viewpoint when it passed the Bankruptcy Reform Act in 1978, commenting that discharge is "the heart of the fresh start provisions of the bankruptcy law." *Matter of Martonak*, 67 B.R. 727, 728 (Bankr.S.D.N.Y.1986) (quoting 11 U.S.C.

§ 727 No. 595, 95th Cong., 1st Sess. 384 (1977); No. 989, 95th Cong., 2nd Sess. 98 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5884, 6340). *See also, In re Zoldan*, 221 B.R. 79, 83 (Bankr.S.D.N.Y. 1998), *aff'd*, 226 B.R. 767 (S.D.N.Y.1998) ("The discharge of debts or 'fresh start' is undoubtedly the philosophical and practical centerpiece of the Bankruptcy Code."); *Rupert v. Krautheimer (In re Krautheimer)*, 210 B.R. 37, 46 (Bankr. S.D.N.Y.1997) ("The concept of the discharge is, without question, the 'holy grail' of the Bankruptcy Code. Indeed, it forms the nucleus around which the Code orbits."). The discharge is the centerpiece or "holy grail" sought by all corporate debtors in reorganization and all individual debtors in reorganization or liquidation. It is the *sine qua non* without which there can be no fresh start for the "honest but unfortunate" debtor.

Section 523(a) of the Bankruptcy Code sets forth those circumstances under which dischargeability may be denied in respect of particular debts. Certain subsections of Section 523(a) deny dischargeability of debts arising from conduct of the debtor which was inherently wrongful, illicit or morally reprehensible. Subsections (2), (4) and (6), on which plaintiff in this adversary proceeding relies, are examples, and it is a prerequisite of each that the claim be predicated upon some demonstrably wrongful, illegal or morally reprehensible conduct by the debtor. Regarding Section 523(a)(2)(A), *see In re Gonzalez*, 241 B.R. 67, 71 (S.D.N.Y.1999) ("To be actionable, the debtor's conduct must involve moral turpitude or intentional wrong; mere negligence, poor business judgment or fraud implied in law (which may exist without imputation of bad faith or immorality) is insufficient." (citations omitted)); *Shearson Lehman Hutton v. Schulman (In re Schulman)*, 196 B.R. 688, 693 (Bankr.

S.D.N.Y.1996) ("Section 523(a)(2)(A) of the Bankruptcy Code provides that a debt is excepted from discharge if it was obtained by 'false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.' The debtor must be guilty of positive fraud or fraud in fact, involving moral turpitude or intentional wrong, and not implied fraud or fraud in law which may exist without the imputation of bad faith or immorality." (citations omitted)). Regarding Section 523(a)(4), *see Samuels v. Ellenbogen (In re Ellenbogen),* 218 B.R. 709, 716 (Bankr.S.D.N.Y. 1998) ("[M]ere negligence, without some element of intentional wrongdoing, breach of fiduciary duty or other identifiable misconduct, does not constitute 'defalcation' within the meaning of section 523(a)(4)"); *Sandak v. Dobrayel (In re Dobrayel),* 287 B.R. 3, 16 (Bankr.S.D.N.Y.2002) (same). Concerning Section 523(a)(6), *see Kawaauhau v. Geiger,* 523 U.S. 57, 61, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998) (The "word 'willful' in [subsection] (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury."); *Navistar Financial Corp. v. Stelluti (In re Stelluti),* 94 F.3d 84, 87 (2d Cir.1996) ("The term 'malicious' means wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will" (citations omitted)).

Other subsections of Section 523(a) are based upon social policy or the nature of the debt, and not on any form of misconduct or wrongdoing by the debtor, such as subsections (1) (taxes and customs duties), (3) (debts not listed or scheduled), (5) (matrimonial or family debts) and (8) (educational debts).

Because of the crucial importance of the discharge to a debtor in bankruptcy, it follows that non-dischargeability is "perceived to be a punitive exception to the 'fresh start' policy and should be found reluctantly." *Matter of Martonak,* 67 B.R. at 728 (citing *In re Huff,* 1 B.R. 354, 357 (Bankr.D.Utah 1979); *Gleason v. Thaw,* 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915)).

■ The courts have repeatedly stressed that the Section 523(a) exceptions to discharge must be strictly construed to comport with the "fresh start" philosophy underlying the Bankruptcy Code. *Household Finance Corp. v. Danns (In re Danns),* 558 F.2d 114, 116 (2d Cir.1977) (interpreting Section 17(a), the predecessor of Section 523) ("[E]xceptions to discharge are to be narrowly construed...." (citations omitted)); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Bonnanzio (In re Bonnanzio),* 91 F.3d 296, 300 (2d Cir. 1996); *Shearson Lehman Hutton, Inc. v. Schulman (In re Schulman),* 196 B.R. 688, 693 (Bankr.S.D.N.Y.1996); *Kuper v. Spar (In re Spar),* 176 B.R. 321, 326 (Bankr. S.D.N.Y.1994) ("To meet the goals intended under the Code, exceptions to discharge must be strictly and literally construed against the creditor and liberally construed in favor of the honest debtor" (citations omitted)); *Hudson Valley Water Resources, Inc. v. Boice (In re Boice),* 149 B.R. 40, 43 (Bankr.S.D.N.Y.1992) ("Exceptions to dischargeability are construed strictly against the creditor and liberally in favor of the debtor to accomplish bankruptcy's 'fresh start' goal" (citations omitted)).

## C. *Plaintiff's claims under subsections (2) and (6) of Section 523(a)*

Little need be said of plaintiff's purported claims under subsections (2) and (6) of Section 523(a). Subsection (2) denies dischargeability of any debt for money, property, services or credit to the ex-

tent obtained by "false pretenses, a false representation, or actual fraud ..." or "use of a statement in writing" that is materially false, respecting the debtor's financial condition, on which the creditor relied and that the debtor caused to be made or published with intent to deceive. Subsection (6) denies dischargeability "for willful and malicious injury by the debtor" to the person or property of another.

Stated succinctly, there are no allegations of fact in the complaint and no findings of fact or conclusions of law in the Surrogate's Court Decision which would provide any basis for declaring the Executor's allowed claim non-dischargeable under subsections (2) or (6). Plaintiff has effectively abandoned his claims under these subsections, and the debtor is entitled to a final judgment of dismissal with prejudice.

### D. *The legal issues under Section 523(a)(4)*

Plaintiff has relied in this adversary proceeding on Section 523(a)(4), which denies a discharge from any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." The key words here obviously are "defalcation while acting in a fiduciary capacity."

As already noted, plaintiff has chosen to base the Estate's claim exclusively on the Surrogate's Court Decision and the doctrine of collateral estoppel. The Surrogate's Court conclusions on which the Executor must rely are the following, quoted from pages 8 to 9 of the Surrogate's Court Decision:

> Officers and directors owe a fiduciary duty and an undivided loyalty to their company and its shareholders [citation omitted]. The fiduciary duty is breached when an officer or director misappropriates the assets and goodwill of the corporation [citation omitted] and de-

rives personal profit or benefit at the expense of the corporation [citations omitted]. As a 50% shareholder, officer and director of Denton–Hyman, NPS and NPA, Hyman owed a fiduciary duty to those corporations. Hyman breached that duty by co-opting the Denton–Hyman, NPS and NPA enterprise for the benefit of the Hyman Agency and for his own personal enrichment. His actions constituted a misappropriation of the tangible assets and goodwill of Denton–Hyman, NPS and NPA. The use of NPS and NPA as feeders of new business for the Hyman Agency without compensation constitutes a breach of fiduciary duty to the corporations for which Hyman and the Hyman Agency are liable. The use of furniture and fixtures of NPS, NPA and Denton–Hyman by Hyman and the Hyman Agency without compensation also constitutes a breach of fiduciary duty to the corporations for which Hyman and the Hyman Agency are liable. The use of Denton–Hyman overrides to subsidize NPS and NPA and to satisfy Hyman Agency debt to the Guardian is a further breach of fiduciary duty for which Hyman and the Hyman Agency are liable.

> Hyman and the Hyman Agency are accountable and liable for the net profits realized in breach of their fiduciary duty to Denton–Hyman, NPS and NPA [citations omitted].

These are the Surrogate's ultimate conclusions on the issue of liability under state law. They are binding on this Court on the issue of liability under state law and, as already noted, the Surrogate's Court Judgment must be allowed as the Executor's claim in this bankruptcy case.

The question, however, is whether the Surrogate's Court necessarily considered and decided the issues under federal law which must be decided in order to support

a finding of non-dischargeability under Section 523(a)(4) of the Bankruptcy Code. This requires analysis of the issues arising under subsection (4). As amplified below, there are three basic issues of federal law which must be decided on the issue of dischargeability under subsection (4), not one of which was briefed by the parties or considered by the Court in the Surrogate's Court proceeding. As to each of these issues, federal law on dischargeability may differ significantly from state law on liability.

### 1. *The meaning of "defalcation"*

■ The word "defalcation" used in subsection (4) as interpreted by federal courts is far narrower than the concept of "misappropriation" under state law.

■ A party may be held liable or accountable under state law for acts or omissions labeled "misappropriation," or "conversion," or "breach of fiduciary duty," done innocently or in good faith, based upon mistake or negligence or simply disagreement between the parties as to their rights and obligations, with no conscious knowledge of or intent to do wrong. Regarding conversion, Justice Cardozo, formerly Chief Judge of New York, stated in *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 79 L.Ed. 393 (1934) that a discharge in bankruptcy "will prevail as against a showing of conversion without aggravated features" and explained that "[t]here may be a conversion which is innocent or technical, an unauthorized assumption of dominion without wilfulness or malice." *Id* at 332, 55 S.Ct. 151. To buttress this point, Justice Cardozo cited to the following cases, among others:

- In *Wood v. Fisk*, 215 N.Y. 233, 241, 109 N.E. 177 (1915), stockbrokers repledged a client's stock to procure a loan. The court noted that while the repledge of the collateral for more than the plaintiff's indebtedness was wrong and may have constituted a conversion under New York law, their liability was held to be dischargeable in bankruptcy because based on the facts at issue, the conversion to the extent there was any wilfulness, was ... "partial and technical rather than absolute and malicious."

- In *Laverty v. Snethen*, 68 N.Y. 522, 527 (1877), an agent was held liable for conversion for parting with the principal's note in a way or for a purpose not authorized. The court noted that "[t]he question of good faith is not involved. A wrongful intent is not an essential element of the conversion."

- In *Boyce v. Brockway*, 31 N.Y. 490, 1865 WL 4700 (1865), where the defendant was found liable for conversion of butter, it was held that "wrongful intent is not an essential element of the conversion" *Id.* at 493. Quoting *Cobb v. Dows*, 9 Barb. 230, 242, the Court explained that there "... need not show a tortious taking, or that the defendants acted in bad faith. If it should appear that they obtained the goods fairly from a person whom they had reason to think was the true owner, or if they acted under a mistake as to the plaintiffs' title, or under an honest but mistaken belief that the property was their own, they would still be liable to plaintiffs if their acts in regard to it amount to a conversion. If they have taken it into their own hands, or disposed of it to others, or exercised any dominion over it whatever, they are guilty of a conversion, and their liability to plaintiffs is established." *Id.* (citations omitted).

■ Similarly, "misappropriation" under New York law may be based upon innocent but mistaken conduct. See *Strough v. Board of Supervisors*, 3 N.Y.S. 110, 112 (Sup.Ct.1888), *modified on other grounds and affirmed*, 119 N.Y. 212, 23 N.E. 552

(1890), in which the defendant was found liable for "illegal, though innocent in intent, misappropriation."

■ This principle extends also to breach of fiduciary duty. Under New York law, corporate fiduciaries may be held liable for breach of fiduciary duty even for conduct undertaken in good faith and innocent intent. As recognized recently in *Matter of Happy Time Fashions, Inc.*, 7 B.R. 665, 670 (Bankr.S.D.N.Y.1980): " It is well established that directors and officers of a corporation are fiduciaries, and their good faith or innocent motives . . . is [sic] no defense to liabilities founded upon breaches of fiduciary obligations."

■ By contrast, the drastic remedy of denial of discharge under Section 523(a)(4) requires the proponent to sustain the burden of proof that the debtor knowingly took property belonging to another under circumstances that showed the taking to be wrongful, illegal or otherwise reprehensible and for which he was held liable. As stated by this Court after a review of the decisions in *In re Ellenbogen*, supra, federal courts have consistently held "that, for purposes of Section 523(a)(4) the term 'defalcation' requires at least some element of wrongdoing on the part of the debtor/fiduciary, and that 'innocent' or merely negligent conduct, even if held actionable in a state court, is not within the scope of the statutory exception to dischargeability under the Bankruptcy Code." *In re Zoldan*, supra.

Two decisions of the Court of Appeals for the Second Circuit are instructive on the meaning of "defalcation" under Section 523(a)(4). In the seminal case of *Central Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510 (2d Cir.1937) (*"Herbst"*), the debtor, Herbst, was the court-appointed receiver of a parcel of land in foreclosure, and therefore a "fiduciary" under the strictest definition. He was awarded a

supplemental fee of $5,674.54 by the lower court, but this award was reversed on appeal. The dissipation of and inability to repay the supplemental fee by Herbst, knowing that this fee was subject to possible reversal on appeal, was held a defalcation by the Court of Appeals. In so holding, Judge Learned Hand said:

> A judge had awarded him the money . . .; but he knew, or if he did not know, he was charged with notice . . . , that the order would not protect him if it were reversed; and that it might be reversed until the time to appeal had expired. He made no effort to learn from the plaintiff whether it meant to appeal, and he did not wait until it could no longer do so; he took his chances. We do not hold that no possible deficiency in a fiduciary's accounts is dischargeable; *In re Bernard*, 87 F.2d 705, 707, we said that "the misappropriation must be due to a known breach of the duty, and not to mere negligence or mistake." Although that word probably carries a larger implication of misconduct than "defalcation," "defalcation" may demand some portion of misconduct; we will assume arguendo that it does.
>
> All we decide is that when a fiduciary takes money upon a conditional authority which may be revoked and knows at the time that it may, he is guilty of a "defalcation" though it may not be a "fraud," or an "embezzlement," or perhaps not even a "misappropriation."

93 F.2d at 512.

In *The Andy Warhol Foundation for Visual Arts, Inc. v. Hayes (In re Hayes)*, 183 F.3d 162, 171 (2d Cir.1999), Chief Judge Ralph Winter, after quoting the foregoing excerpt from *Herbst*, said: "Judge Hand's discussion remains the most authoritative explication of the measure of the term [defalcation]. *See Tur-*

*ner*, 134 B.R. at 658 (collecting cases)." In *In re Hayes*, the debtor, Edward W. Hayes, was retained as counsel for the estate of Andy Warhol. Hayes had been paid $4.85 million in fees under a retainer agreement which had been twice amended. Hayes sought additional compensation in the Surrogate's Court over objection by the Executor, and the Surrogate concluded that Hayes' services were worth $7.2 million. On appeal, the Appellate Division reduced Hayes' fee entitlement to $3.5 million. As a result of the Appellate Division judgment, Hayes owed the estate $1.35 million, which judgment was assigned to the Andy Warhol Foundation in August 1986. Shortly thereafter Hayes filed for bankruptcy, and the Foundation timely commenced an adversary proceeding to declare its claim non-dischargeable under Section 523(a)(4).

In ruling that the Foundation's claim was not dischargeable under Section 523(a)(4), Chief Judge Winter said, "... any *ex ante* duty on Hayes's part to account for such fees must be based upon a violation of his fiduciary duty and resultant unreasonableness of his claim of right or title to such funds." He continued:

> [E]ven assuming, as did Judge Hand, that defalcation demands "some portion of misconduct," we hold that Hayes committed a defalcation.
>
> ... Hayes' fee was paid pursuant to an *ex ante* invalid fee agreement that matched fees, not to value of services or even to the value of an estate with assets of stable value, but to a rising art market that had nothing to do with the services he was to perform.
>
> ... Hayes's conduct was inconsistent with his obligation to deal fairly, albeit at a profit to himself, with the estate in establishing a fee arrangement because there was no attempt to match fees and the value of services—even to the extent

of imposing a cap on his fees—as required by New York law.... Rather, the payments were pursuant to the invalid fee agreement. Moreover, having arranged a fee agreement that did not match payments to value of services, Hayes chose not to limit his spending to a conservative estimate of what a court might eventually approve or to seek pre-approval of that questionable agreement in New York courts....

> On the facts and circumstances presented, we therefore conclude that Hayes's conduct was sufficiently at odds with his fiduciary obligations to constitute a defalcation within the meaning of Section 523(a)(4) and the gloss put upon it by *Herbst*.

183 F.3d at 172–173.

In short, *Herbst* affirmed and *Hayes* reaffirmed the governing principle in the Second Circuit that the term "defalcation" as used in Section 523(a)(4) demands "some portion of misconduct" on the part of a fiduciary. In *Herbst*, the misconduct consisted in taking for himself, spending and failing to repay funds belonging to the foreclosure estate knowing that his entitlement to the funds was subject to objection and appeal by the beneficiary of the estate. In *Hayes*, the misconduct consisted in the receipt, retention, and failure to repay fees by an attorney-fiduciary pursuant to an unlawful and invalid retainer agreement knowing that the fees in question were subject to objection and appeal by the executor of the estate to which the funds in question belonged.

In this case, for obvious reasons, neither the parties nor the court in the Surrogate's Court proceeding considered or had occasion to consider the restrictive definition of "defalcation" under the Bankruptcy Code or the differences between Section 523(a)(4) defalcation and state law concepts of misappropriation. Nowhere does

the word "defalcation" appear in the Surrogate's Court Decision. Given the material differences between the meaning of "defalcation" under federal bankruptcy law and the concepts of misappropriation and breach of fiduciary duty under state law, it simply cannot be said that the federal question at issue in this adversary proceeding was considered and decided in the Surrogate's Court proceeding.

This conclusion is underscored when one attempts to understand what it was that Hyman did or did not do after Denton's death that could fairly be characterized as a defalcation, or as intentionally wrongful, illicit or reprehensible, such as to justify denial of Hyman's discharge. *There is no finding of fact by the Surrogate, and no claim by the plaintiff in this adversary proceeding, that Hyman took money or property of Denton–Hyman Agency, NPS or NPA without accounting for it—i.e., no claim of defalcation in the ordinary dictionary sense of that word.*

Nor is it clear what Hyman did that could be characterized as "misconduct" within the scope of the *Herbst* and *Hayes* decisions. What Hyman actually did after Denton's death was to seek his individual appointment as Guardian's agent in Westchester and to organize his own agency to carry on the insurance business. That surely was not wrongful in any respect, since Denton was dead and Guardian forbade the former Denton–Hyman Agency to continue in the business. The Executor had knowledge of these facts and acquiesced in Hyman's continuation of the insurance business by himself in his own name, with no further contribution of time and effort, capital or risk by the Denton–Hyman Agency or the Denton Estate. Hyman also continued to operate (and fund the operating deficit) of NPS and NPA, at no cost in time, effort, money or risk to the Denton Estate as the other 50%

shareholder. This was not wrongful in any respect, and the Executor acquiesced in this also with full knowledge of what Hyman was doing. That the Executor acquiesced in Hyman's continuation of the "enterprise" is not surprising since it enabled Hyman to generate sufficient income to pay off the entire $1.6 million indebtedness of the Denton–Hyman Agency and NPS, for which both Hyman and the Denton Estate were jointly and severally liable.

In addition to the foregoing, Hyman engaged in protracted negotiations with the Executor from 1989 until 1993 or early 1994 with respect to a buy-out of the Denton Estate's interest in the defunct Denton–Hyman Agency, NPS and NPA. The parties did not reach agreement in their negotiations, and as a consequence the Executor commenced the proceeding against Hyman in the Surrogate's Court. But the fact that the negotiations failed, and that the Surrogate's Court ultimately ruled that the Denton–Hyman Agency was entitled to be paid a portion of Hyman Agency profits, does not mean that Hyman engaged in a "defalcation" under any definition of that term. While it appears that Hyman utilized residual commissions of the Denton–Hyman Agency to repay in whole or in part (the record before this Court is unclear) the $1.6 million indebtedness of the Denton–Hyman Agency, NPS and NPA, it bears repeating that there is no finding of fact or conclusion in the Surrogate's Court Decision that Hyman misappropriated to himself any money or property belonging to the Denton–Hyman Agency, NPS or NPA, the three corporate entities of which Hyman could be said to be a fiduciary as an officer and director. The damages assessed against Hyman by the Surrogate were not on account of funds belonging to and taken from the Denton–Hyman Agency, NPS or NPA, but represented a share of profits earned *by Hyman's own agency*

formed after Denton's death. This is in sharp contrast to the defalcation found in *Herbst* and *Hayes,* which involved the fiduciary's taking of and failure to repay funds belonging to the entity of which he was a fiduciary. No such finding appears in the Surrogate's Court Decision.

As shown in the passage from pages 8–9 of the Surrogate's Court Decision quoted above, what Hyman did that the Surrogate's Court found to be wrongful was "co-opting the Denton–Hyman, NPS and NPA enterprise for the benefit of the Hyman Agency and for his own personal enrichment ... *without compensation* ..." (emphasis supplied). What the Surrogate characterized as a breach of fiduciary duty was Hyman's failure *to compensate* the Denton–Hyman Agency for carrying on the "enterprise" which had been established by Denton and Hyman before Denton's death. This failure was no more nor less than the failure of the negotiations which were carried on between Hyman and the Executor from 1989 until late 1993 or early 1994 with respect to a buy-out by Hyman of the Denton Estate's 50% interest in the "enterprise" carried on for thirteen months by the Denton–Hyman Agency, NPS and NPA.

Undoubtedly there were reasonable, good faith grounds for each side to dispute the compensable value of the "enterprise." After all, Denton had died and could no longer contribute anything to the business; the Denton Hyman Agency was barred from further participation in the business, and its only assets (the residual commissions earned in its thirteen months in business) may have been used in whole or in part to pay off the $1.6 million debt of the "enterprise;" and the other corporate entities in which the Estate had a 50% interest, NPS and NPA, had negligible assets and never earned a profit. But reasonable or not, the refusal of Hyman to agree to

the Executor's demands was not a defalcation and should not result in denial of dischargeability.

During oral argument on the summary judgment motions, this Court repeatedly asked the attorneys for plaintiff, including the Executor's counsel in the Surrogate's Court proceeding, to specify precisely what it was that Hyman did that was illicit, morally reprehensible or otherwise wrongful, other than the fact that he ultimately did not reach agreement with the Executor as to the amount to be paid in a buy-out of the Denton Estate's 50% interest in Denton–Hyman Agency, NPS and NPA. Stated differently, the Court asked counsel what it was that Hyman should have done differently after Denton's death, other than failing to reach agreement in the buy-out negotiations. Despite repeated opportunities to answer these questions, plaintiff's counsel never identified any specific conduct on the part of Hyman which could be characterized as a defalcation, or any conduct of any kind that was wrongful, illegal or morally reprehensible, other than the fact that the parties ultimately did not reach agreement on a buy-out. Nor did the Surrogate in his Decision.

There is, in short, nothing in the complaint or in the record before this Court and nothing in the Surrogate's Court Decision which could fairly be said to constitute a "defalcation" within the meaning of Section 523(a)(4) of the Bankruptcy Code, as expounded in *Herbst, Hayes* and countless other federal court decisions.

### 2. *The restricted concept of "fiduciary capacity"*

The Surrogate's Court held that under New York corporate law Hyman, as an officer and director of the Denton–Hyman Agency, NPS and NPA, had a "fiduciary duty" to the other 50% shareholder of each of these corporate entities. But as stated

by this Court in *In re Dobrayel*, 287 B.R. at 14, "[t]he meaning of 'fiduciary capacity' under Federal laws is more restricted than under the more general common law or state law definitions."

 The meaning of "fiduciary capacity" under Federal laws is narrower than under the more general common law or state law definitions. *Stone v. Stone (In re Stone)*, 94 B.R. 298, 302 (S.D.N.Y. 1988), *aff'd*, 880 F.2d 1318 (2d Cir.1989); *In re Midkiff*, 86 B.R. 239, 241 (Bankr. D.Colo.1988); *Anderson v. Currin (In re Currin)*, 55 B.R. 928, 932 (Bankr.D.Colo. 1985); *In re Zoldan*, 221 B.R. at 84 ("The concept of fiduciary under Section 523(a)(4) ... is far narrower in scope than under state law"). Under Section 523(a)(4), "fiduciary capacity" applies only to technical or express trusts and not to trusts ex maleficio. *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 79 L.Ed. 393 (1934); *In re Dobrayel*, 287 B.R. at 14; *In re Scheller*, 265 B.R. at 52 (citations omitted); *NesSmith Electric Co., Inc. v. Kelley (In re Kelley)*, 84 B.R. 225, 229 (Bankr.M.D.Fla.1988) (same); 4 COLLIER ON BANKRUPTCY, ¶ 523.10[1][c], p. 523–72 (15 ed. rev. Rel. 65 –3/98). "Such technical or express trusts must exist prior to and independently of the wrongful conduct giving rise to the claim of non-dischargeable debt." *In re Dobrayel*, 287 B.R. at 14 (citations omitted). *But see also LSP Inv. Partnership v. Bennett (In re Bennett)*, 989 F.2d 779, 784–85 (5th Cir.1993), *cert. denied*, 510 U.S. 1011, 114 S.Ct. 601, 126 L.Ed.2d 566 (1993) ("There has been some disagreement among the courts as to what exactly is meant by the requirement that there be a 'technical trust' to satisfy section 523(a)(4). Most courts today, however, recognize that the 'technical' or 'express' trust requirement is not limited to trusts that arise by virtue of a formal trust agreement, but includes relationships in which trust-type obligations are imposed pursuant to statute or common law.").

 While the definition of fiduciary capacity is a matter of Federal law, state law may be consulted in determining whether and when express or technical trusts exist in "this strict sense." *In re Scheller*, 265 B.R. at 52 ("State law is to be consulted to determine when a trust in this strict sense exists") (citing *Zohlman v. Zoldan*, 226 B.R. at 773); *Ragsdale v. Haller (In re Ragsdale)*, 780 F.2d 794, 796 (9th Cir.1986) ("Although the concept of fiduciary is to be narrowly defined as a matter of federal law, state law is to be consulted to determine when a trust in this strict sense exists." (citation omitted)); *Krishnamurthy v. Nimmagadda (In re Krishnamurthy)*, 209 B.R. 714, 722 (9th Cir. BAP 1997), *aff'd*, 125 F.3d 858 (9th Cir.1997), *cert. denied*, 524 U.S. 930, 118 S.Ct. 2328, 141 L.Ed.2d 702 (1998) (determining whether the relationship is fiduciary under Section 523(a)(4) is an issue of Federal law for which state law can be consulted). However, the applicable state law that creates a fiduciary relationship must clearly enumerate the fiduciary duties and identify the trust res. *See Johnson v. Woldman*, 158 B.R. 992, 996 (N.D.Ill.1993), *aff'd*, 92 F.3d 546 (7th Cir. 1996).

As stated by the Court of Appeals in *Hayes*,

It has been clear, at least since 1841, that the defalcation exception is not limited to express trusts, *i.e.*, situations where a trustee is a beneficial owner of a *res* held and managed for a named beneficiary. Indeed, the act stated as much in specifying "executor[s], administrator[s], guardian[s] or trustee[s]" and then adding others "acting in any other fiduciary capacity." Moreover, Section 4 of the same act provided that "no

person should be entitled to a discharge who should 'apply trust funds to his own use.'" *Hennequin v. Clews,* 111 U.S. 676, 679, 4 S.Ct. 576, 28 L.Ed. 565 (1884) (quoting ch. IX, § 4, 5 Stat. 441).

Although recognizing that "fiduciary" covers more than express or formal trust relationships, Chief Judge Winter in *Hayes* reaffirmed the principle that the fiduciary relationship must exist *before* the defalcation giving rise to liability. Discussing the Supreme Court decision in *Davis v. Aetna Acceptance Corp.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934), Chief Judge Winter said:

> ... Justice Cardozo, writing for the Court, quoted *Chapman's* language that "the statute 'speaks of technical trusts, and not those which the law implies from the contract.'" *Id.* at 333, 55 S.Ct. 151 (quoting *Chapman,* 43 U.S. at 208). His concern was the same as that expressed in *Chapman*—that the act not be construed so as to except from discharge normal commercial debts. To this end, he explained:
>
> > It is not enough that, by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee ex maleficio. He must have been a trustee before the wrong and without reference thereto.... "The language would seem to apply only to a debt created by a person who was already a fiduciary when the debt was created."
>
> *Id.* (quoting *Upshur v. Briscoe,* 138 U.S. 365, 378, 11 S.Ct. 313, 34 L.Ed. 931 (1891)).

The requirement of a pre-existing fiduciary relationship and the rejection of the notion of a trustee *ex maleficio* as a basis for non-dischargeability under Section 523(a)(4) obviously were not issues presented to or considered by the Surrogate's Court, although, as amplified below, these issues are vital to a determination of non-dischargeability under the Bankruptcy Code.

### 3. *The limitation "while acting" in a fiduciary capacity*

 Accepting the proposition that a corporate officer or director may be deemed a "fiduciary" with respect to his stewardship of corporate property within the meaning of Section 523(a)(4), that alone is not sufficient to hold a debt non-dischargeable under subsection (4). The statute applies only to a debt incurred on account of conduct, a defalcation, perpetrated while the debtor was acting in the fiduciary capacity in question. As this Court explained in *Zohlman v. Zoldan (In re Zoldan),* 221 B.R. 79, 87 (Bankr. S.D.N.Y.1998), *aff'd,* 226 B.R. 767 (S.D.N.Y.1998).

> The mere *existence* of a fiduciary relationship is not sufficient to deny dischargeability under Section 523(a)(4). The Court must also make a finding that the debtor-defendant was *"acting* in a fiduciary capacity" with respect to the particular conduct giving rise to the liability which is claimed to be non-dischargeable.

(emphasis in original). *See Otto v. Niles (In re Niles),* 106 F.3d 1456, 1459 (9th Cir.1997) (The plaintiff-creditor must demonstrate that "the debtor acted as a fiduciary to the creditor at the time the debt was created.") (quoting *Klingman v. Levinson,* 831 F.2d 1292, 1295 (7th Cir.1987)); *Matter of Koszuth,* 43 B.R. 104, 107–108 (Bankr.Fla.1984) (citing *Intercontinental Life Ins. Co. v. Good (In re Good),* 33 B.R. 163 (Bankr.M.D.Fla.1983)) ("In the context of § 523(a)(4) the creditor must not only establish that the wrongful act gave rise to personal liability but also that the Debtor performed the wrongful act while acting in

a fiduciary capacity."); *Rosen v. Rosen (In re Rosen)*, 232 B.R. 284, 296 (Bankr. E.D.N.Y.1999) ("If a fiduciary relationship did exist, the second step is to examine if fraud or defalcation occurred during that relationship.").

Hyman was not held liable by the Surrogate for any defalcation or other conduct "while acting" in his capacity as a director and officer of any of the corporate entities involved. Indeed, as already noted, there is no finding by the Surrogate and no allegation by plaintiff of any defalcation at all, *i.e.*, no taking by Hyman for his own unaccounted-for use of funds of the three corporate entities in which the Denton Estate had a 50% interest.

Nor is there any finding of fact in the Surrogate's Court Decision to the effect that Hyman did anything that was wrongful, illegal or morally reprehensible "while acting" in his capacity as an officer and director of the Denton–Hyman Agency, NPS, NPA or his own Hyman Agency. The Surrogate did not find (and plaintiff has not argued) that it was a breach of fiduciary duty or wrongful for Hyman to become Guardian's insurance agent for Westchester County after Denton's death, or to form and operate the Hyman Agency as successor to the Denton–Hyman Agency, or to continue the use of NPS and NPA as feeders for the Hyman Agency, and there is no dispute that the Executor had full knowledge of and acquiesced in Hyman's conduct in so doing.

The Executor has never claimed that Hyman committed any breach of duty in his conduct as an officer and director of Denton Hyman Agency, NPS or NPA. Plaintiff's counsel acknowledged in this proceeding the obvious fact that the Surrogate's Court proceeding was brought only because the Executor's lengthy and difficult negotiations with Hyman for a buyout of the Estate's 50% interest in the "enter-prise" did not result in agreement. And the Surrogate's Court found Hyman liable solely because he did not reach agreement to compensate the Estate for a buyout of the Estate's 50% interest, and not for any breach of duty in his capacity as an officer and director of the three entities.

The point here is that Hyman *was not acting as a fiduciary* for the Denton Estate in the buyout negotiations. The Executor was the fiduciary acting for the Estate in those negotiations, and Hyman was the adversary.

Aside from the lack of any defalcation, the fatal defect in plaintiff's theory under Section 523(a)(4) is that Hyman was not acting in the capacity of a fiduciary in connection with the negotiations for a buyout. Those negotiations were conducted at arm's length, between parties with adverse interests and conflicting views as to the proper compensation to be paid by Hyman to the other 50% shareholder, with each side being represented by competent professionals. The relationship of two parties engaging in arm's length negotiations with respect to the purchase and sale of an asset or an interest is never fiduciary—it is adverse and conflicted. The failure to reach an agreement in such a negotiation is a failure of both sides, and does not represent breach of a trust or a trust relationship under the Bankruptcy Code. The fact that a court may ultimately resolve the parties' dispute in the context of a litigation does not mean that the losing party is to be deemed guilty of wrongdoing, much less a defalcation, "while acting in a fiduciary capacity" within the meaning of Section 523(a)(4) of the Bankruptcy Code.

### III. *Summary Judgment and the Right to a Trial*

As noted at the outset, this matter came before the Court on cross-motions for sum-

mary judgment. With respect to plaintiff's claim under Section 523(a)(4) based on collateral estoppel, this Court ruled at the November 15 hearing only that the Surrogate's Court Decision did not consider the issues or contain findings and conclusions required under the Bankruptcy Code. In the interlocutory ruling on November 15, this Court did not grant judgment against plaintiff on the merits, but simply denied both cross-motions, ruling that both sides should have the opportunity to present evidence at a trial on the Section 523(a)(4) claim. There are sharply contested issues of fact requiring a trial on the claims under Section 523(a)(4), and both plaintiff and defendant are entitled to a day in court, this Court, on the bankruptcy issues not considered or decided in the Surrogate's Court.[2]

However, subsequent to the November 15 hearing, plaintiff has waived the Estate's right to a trial. He has thereby deprived Hyman of the right to present rebuttal evidence at a trial on the hotly disputed factual issues regarding the existence or not of a defalcation, whether there was "some portion of misconduct" in any of Hyman's acts or omissions, and whether Hyman committed any defalcation or misconduct in his capacity as a fiduciary of the three jointly-owned corporate entities, as opposed to his capacity as an adverse party negotiating at arm's length the price of a buy-out with the Executor.

Plaintiff has thus chosen to rely exclusively on the Surrogate's Court Decision to sustain the Estate's heavy burden to deny Hyman's statutory right to discharge on the Denton Estate's claim. It is a burden the Decision cannot sustain because the bankruptcy issues were not litigated in the Surrogate's Court.

### Conclusion

The legal standards for a finding of liability under New York State law, as articulated in the Surrogate's Court Decision, are quite different from the legal and factual requirements for a determination of non-dischargeability under Section 523(a)(4) of the Bankruptcy Code. The Surrogate's Court was not presented with and did not decide the legal issues which must be resolved to determine a claim for non-dischargeability under Section 523(a)(4). The Surrogate's Court Decision does not contain findings of fact and conclusions of law necessary to support denial of dischargeability of the Executor's claim in the debtor's bankruptcy case under the doctrine of collateral estoppel. Accordingly, plaintiff's claims under Section 523(a) based on collateral estoppel must be dismissed. The Court will enter an appropriate order finally disposing of this adversary proceeding.

---

**2.** By contrast, in *Rothman v. Beeber (In re Beeber)*, 239 B.R. 13 (Bankr.E.D.N.Y.1999), cited by plaintiff, the Bankruptcy Court rendered decision on a Section 523(a)(4) claim and many other issues after a full trial on the merits in the Bankruptcy Court. The Section 523(a)(4) claim was granted based on a litany of admitted "facts regarding the Debtor's use of funds of the corporation for his personal expenses; ...." 239 B.R. at 32 *et seq.* No such findings appear in the Surrogate's Court Decision.