**In re Eugene DUNCAN, Debtor.**

**Elaine L. Chao, Secretary of Labor, United States Department of Labor, Plaintiff,**

v.

**Eugene Duncan, Defendant.**

**Bankruptcy No. 02–85792–dte. Adversary No. 02–08406–ess.**

United States Bankruptcy Court, E.D. New York.

Sept. 2, 2005.

---

Office of the Solicitor, New York, By John G. Campbell, Esq., Patricia M. Rodenhausen, Esq., for the U.S. Department of Labor.

Zinker, Gelfand & Herzberg, LLP, Smithtown, By Jeffrey Herzberg, Esq., for Eugene Duncan.

### MEMORANDUM DECISION GRANTING THE MOTION FOR SUMMARY JUDGMENT BROUGHT BY THE U.S. DEPARTMENT OF LABOR

ELIZABETH S. STONG, Bankruptcy Judge.

Before the Court is a motion for summary judgment (the "Motion" or the "Motion for Summary Judgment") of Elaine Chao, the Secretary of Labor, United States Department of Labor in this adversary proceeding (the "Adversary Proceeding"). Eugene Duncan (the "Defendant") filed for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on August 13, 2002, and the case was converted to one under Chapter 7 on February 24, 2003.[1] On November 12,

---

1. The Defendant filed a voluntary Chapter 13 petition on May 27, 2005, in the United States Bankruptcy Court for the Eastern District of New York (Central Islip).

2002, the Secretary of Labor (the "Secretary" or "DOL") filed a complaint (the "Complaint") commencing this Adversary Proceeding, which seeks to establish the nondischargeability of a debt under Section 523(a)(4) of the Bankruptcy Code. This section creates an exception to discharge for debts arising from "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4).

On December 12, 2002, the Defendant filed an answer (the "Answer") to the Complaint. On October 15, 2004, the Secretary filed the Motion for Summary Judgment, which consisted of Plaintiff's Memorandum of Law in Support of Her Motion for Summary Judgment ("Pl. S.J. Br."), and Plaintiff's L.B.R. 7056–1 Declaration ("Campbell Decl."). On December 27, 2004, the Defendant filed Defendant's Memorandum of Law in Opposition to the Plaintiff's Memorandum of Law ("D. Opp. Br."), together with a Local Rule Affidavit in Opposition to the Motion for Summary Judgment filed by the United States Department of Labor ("Herzberg Aff."). On January 19, 2005, the Secretary filed a Reply Memorandum of Law in Support of Her Motion for Summary Judgment ("Pl. Reply"), and the Defendant filed the Debtor–Defendant Eugene Duncan's Sur–Reply to Plaintiff's Reply Memorandum in Support of Her Motion for Summary Judgment ("D. Sur-reply").

Hearings on the Motion for Summary Judgment were held on January 28, 2005, February 9, 2005, and May 19, 2005, at which counsel for the Secretary and the Defendant appeared and were heard. After consideration of the submissions, the arguments of counsel, and the entire record before the Court, for the reasons set forth below, the Motion for Summary Judgment is granted.

### Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(b)(2)(I), as it is a core proceeding concerning the dischargeability of a particular debt. The following are the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rule 7052.

### Procedural History

The Defendant seeks a discharge of, among other debts, liability resulting from a partial consent judgment dated February 6, 2001 (the "Consent Judgment"), that was entered in an action brought in the U.S. District Court for the Eastern District of New York (the "District Court Action") by the DOL seeking equitable relief, including restitution, under Section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, for ERISA violations allegedly committed by the Defendant in his role as a fiduciary of the International Workers' Guild Health and Welfare Trust (the "Plan"). The Defendant and the Secretary reached a settlement in the District Court Action on January 16, 2001, and a Consent Judgment memorializing this settlement was approved by the District Court by an order dated February 6, 2001. See Campbell Decl. ¶¶ 11, 16, and Exh. F (Consent Judgment). The Defendant also pleaded guilty to one felony count of a violation of 18 U.S.C. § 1347, health care fraud, on September 22, 2000. Second Motion for Summary Judgment by the Defendant Eugene Duncan ("D. Second S.J. Motion"), Adversary Proceeding Docket Entry 19, Exh. D (judgment in U.S. v. Duncan entered on May 3, 2002).

The Consent Judgment requires the Defendant to make restitution to the Plan in a series of scheduled payments. The total

amount of restitution is not less than $250,000, and could be as much as $8 million, depending on the Defendant's financial condition. Campbell Decl., Exh. F (Consent Judgment). The Defendant acknowledges that he signed the Consent Judgment establishing the debt, and the parties do not dispute the meaning of the provisions of the Consent Judgment, including the amounts that the Defendant owes under it. *See* Pl. S.J. Br. at 7; D. Opp. Br. at 4–5. Nor do the parties dispute that the Defendant has made no payments due under the Consent Judgment. Complaint ¶ 8; Answer ¶ 5. The Secretary seeks a declaration that the debt resulting from the Consent Judgment (the "Consent Judgment Debt") is nondischargeable under Section 523(a)(4) of the Bankruptcy Code because it arises from defalcations that the Defendant committed in a fiduciary capacity.

The Defendant answered the Complaint and then made two motions for summary judgment. In his first motion for summary judgment, the Defendant argued that because the Secretary had entered into a settlement agreement with the Defendant without reserving the right to challenge the dischargeability of the debt in the event of the Defendant's bankruptcy, the Secretary waived any right to seek a determination that the debt was nondischargeable. Defendant's Motion for Summary Judgment at 7. The first motion for summary judgment was withdrawn after the Supreme Court decided *Archer v. Warner*, 538 U.S. 314, 123 S.Ct. 1462, 155 L.Ed.2d 454 (2003). Adversary Proceeding Docket Entry 12 (letter dated April 9, 2003, from Jeffrey Herzberg).

In his second motion for summary judgment, the Defendant argued that the Secretary lacked standing to bring, and the District Court lacked subject matter jurisdiction over, the District Court Action. D.

Second S.J. Motion at 12, Adversary Proceeding Docket Entry 19. This Court denied that motion on March 24, 2004. *Chao v. Duncan (In re Duncan)*, 308 B.R. 138, 143 (Bankr.E.D.N.Y.2004). This Court held, among other things, that the Secretary, in light of her statutory role as "protector of employee benefit plans," coupled with several significant public policy considerations in her favor, has standing to bring this Adversary Proceeding to contest the dischargeability of the Defendant's debt. *Id.* at 145. In addition, this Court found that principles of res judicata barred the Defendant from contesting the District Court's subject matter jurisdiction or the Secretary's standing in the District Court Action. *Id.* at 149. Finally, this Court concluded that the Defendant, as the moving party, did not meet his burden to show that he was entitled to summary judgment on the merits of the Secretary's dischargeability claim. *Id.*

The Secretary filed this Motion for Summary Judgment on October 15, 2004. She argues that the record shows the Plan was an ERISA plan (or several smaller ERISA plans with an identifiable trust *res* ), and thus a trust of which Duncan was the fiduciary. Pl. S.J. Br. at 11–12. The Secretary also asserts that the record shows the Defendant was a fiduciary of the Plan, even though he was not formally named a fiduciary. *Id.* at 19. Finally, the Secretary argues that the record shows that the Defendant committed defalcations while he was acting as a fiduciary to the Plan, and breached his ERISA duties as a fiduciary, by causing the Plan to make payments to sham entities that rendered no legitimate services to the Plan's participants and causing the Plan to make excessive payments to Fidelity Group, Inc. ("Fidelity"), of which the Defendant was the President and fifty-percent owner. *Id.* at 23.

After consideration of the entire record, including hearings held on January 28, 2005, February 9, 2005, and May 19, 2005, the Secretary's motion for summary judgment is granted.

### *Discussion*

*The Standard for Summary Judgment*

Federal Rule of Civil Procedure 56, made applicable to this adversary proceeding by Bankruptcy Rule 7056, provides that summary judgment is appropriate when " 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting FED. R. CIV. P. 56(c)). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "A fact is material only if it affects the result of the proceeding and a fact is in dispute only when the opposing party submits evidence such that a trial would be required to resolve the differences." *Hassett v. Altai, Inc. (In re CIS Corp.)*, 214 B.R. 108, 118 (Bankr.S.D.N.Y.1997).

The moving party has the burden of demonstrating the absence of any genuine issue of material fact, and all of the inferences to be drawn from the underlying facts must be viewed by the Court in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. But to defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. Rather, it

must present "significant probative evidence" that a genuine issue of material fact exists. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," there is no genuine issue of material fact for trial and summary judgment is appropriate. *Matsushita*, 475 U.S. at 580, 106 S.Ct. 1348. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir.2000), *cert. denied*, 540 U.S. 811, 124 S.Ct. 53, 157 L.Ed.2d 24 (2003).

*The Secretary's Section 523(a)(4) Claim*

Section 523(a)(4) of the Bankruptcy Code provides that a "discharge under Section 727 ... of this title does not discharge an individual debtor from any debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). The Secretary objects to the discharge of the Consent Judgment debt because, she asserts, it arises from fiduciary defalcations committed by the Defendant. Pl. S.J. Br. at 1.

The Supreme Court has held that in order to prevail on a claim of nondischargeability under Section 523(a)(4), the burden is on the party claiming nondischargeability, and that party must meet its burden by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). *See Bethpage Fed. Credit Union v. Furio (In re Furio)*, 77 F.3d 622, 624 (2d Cir.1996); *Cmty. Mut. Sav. Bank v. Landrin (In re Landrin)*, 173 B.R. 307, 310 (Bankr.S.D.N.Y.1994). Exceptions to discharge under Section 523(a) must be strictly construed in favor of the debtor in order to comply with the "fresh start" policy underlying the Bankruptcy Code. *See, e.g., Grogan*, 498 U.S. at 286, 111 S.Ct. 654; *Gleason v. Thaw*, 236 U.S. 558, 562, 35 S.Ct. 287, 59 L.Ed. 717 (1915); *Household Fin. Corp. v. Danns (In re Danns)*,

558 F.2d 114, 116 (2d Cir.1977); *Nat'l Union Fire Ins. Co. v. Bonnanzio (In re Bonnanzio)*, 91 F.3d 296, 300 (2d Cir. 1996); *Nat'l Bank of N. America v. Newmark (Matter of Newmark)*, 20 B.R. 842, 852–53 (Bankr.E.D.N.Y.1982).

A creditor must satisfy three elements in order to invoke the Section 523(a)(4) exception to the dischargeability of a debt. *See* 11 U.S.C. § 523(a)(4); *Zohlman v. Zoldan*, 226 B.R. 767, 772 (S.D.N.Y.1998); *Maciolek v. Firer (In re Firer)*, 317 B.R. 457, 465–66 (Bankr. D.Conn.2004); *Eavenson v. Ramey*, 243 B.R. 160, 164 (N.D.Ga.1999); *Harsch v. Eisenberg (In re Eisenberg)*, 189 B.R. 725, 730 (Bankr.E.D.Wis.1995). First, the debt must result from a fiduciary's defalcation under an "express or technical trust" involving the entrusting of money or other property to a fiduciary for the benefit of another. *In re Zoldan*, 226 B.R. at 772–73. *See Trustees of the Colo. Ironworkers Pension Fund v. Gunter (In re Gunter)*, 304 B.R. 458, 460 (Bankr.D.Colo.2003). Second, the debtor must have acted in a fiduciary capacity with respect to the trust. *In re Zoldan*, 226 B.R. at 772; *Gore v. Kressner (In re Kressner)*, 155 B.R. 68, 73 (Bankr.S.D.N.Y.1993). Third, the transaction in question must be a "defalcation" within the meaning of bankruptcy law. *Andy Warhol Found. for Visual Arts, Inc. v. Hayes (In re Hayes)*, 183 F.3d 162, 169 (2d Cir.1999); *In re Zoldan*, 226 B.R. at 775.

A. *Whether the Consent Judgment Debt arose in connection with an express or technical trust*

The first question to be answered in a nondischargeability action under Section 523(a)(4) is whether the debt arose in connection with an express or technical trust. *In re Zoldan*, 226 B.R. at 772. To establish the existence of a statutory trust, the Secretary must show that property or money was entrusted to a "trustee," that a statute creates or identifies a "fiduciary" duty, and finally, that the trust was in place when the defalcation giving rise to the debt occurred. *In re Gunter*, 304 B.R. at 460–61.

Section 523(a)(4) applies only to express or technical trusts, not to constructive trusts, implied trusts, or trusts implied on the basis of wrongful conduct. *In re Zoldan*, 226 B.R. at 772; *Air Traffic Conference of Am. v. Paley (In re Paley)*, 8 B.R. 466, 469 (Bankr.E.D.N.Y.1981); *In re Hayes*, 183 F.3d at 166; *In re Gunter*, 304 B.R. at 460. Constructive trusts or trusts *ex maleficio* do not satisfy this element of Section 523(a)(4); rather, the trust must exist before and apart from the circumstances giving rise to the contested debt. *Citik Ka Wah Bank Ltd. v. Wong (In re Wong)*, 291 B.R. 266, 278 (Bankr. S.D.N.Y.2003); *In re Paley*, 8 B.R. at 469.

Both the language and the legislative history of ERISA suggest that Congress intended traditional concepts of trust law to be applied to cases brought under ERISA. *Friedlander v. Doherty*, 851 F.Supp. 515, 520 (N.D.N.Y.1994). In *Firestone Tire & Rubber Co. v. Bruch*, the Supreme Court noted that "ERISA abounds with the language and terminology of trust law." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). For example, terms such as "participant," "beneficiary," "fiduciary," and "trustee," which arise from trust law, appear throughout the statute. *See, e.g.*, 29 U.S.C. §§ 1002(7) (participant); 1002(8) (beneficiary); 1002(21)(A) (fiduciary); 1103(a) (trustee). ERISA Section 403(a) requires that "all assets of an employee benefit plan shall be held in trust by one or more trustees." 29 U.S.C. § 1103(a). In addition, ERISA provides that the assets of an employee

benefit plan "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1103(c).

Bankruptcy courts have found ERISA-covered employee benefit plans to constitute trusts for purposes of Section 523(a)(4). *See, e.g., In re Gunter,* 304 B.R. at 461; *Eavenson,* 243 B.R. at 166 ("ERISA statutorily satisfies the elements of a technical trust under § 523(a)(4)."); *Cochran v. Coleman (In re Coleman),* 231 B.R. 393, 395 (Bankr.S.D.Ga.1999).

ERISA defines the term "employee welfare benefit plan" as:

> [A]ny plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization or by both, to the extent that such a plan, fund or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death, or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

29 U.S.C. § 1002(1).

Courts have construed this definition broadly. An employee welfare benefit plan exists if "from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, source of financing, and procedures for receiving benefits." *Donovan v. Dillingham,* 688 F.2d 1367, 1373 (11th Cir.1982). Courts have found that ERISA-covered employee welfare benefit plans exist where an employer purchases health insurance for employees. *See Albright v. Union Bankers Ins. Co.,* 85 F.Supp.2d 1302, 1304 (S.D.Fla.1999) ("ERISA may apply to an employee welfare-benefit plan, even though an employer's involvement in the plan is limited to the purchase of insurance"). *See also Bonestroo v. Continental Life & Acc. Co.,* 79 F.Supp.2d 1041, 1046 (N.D.Iowa 1999) ("There is no requirement under ERISA that the employer play any role in the administration of the plan in order for it to be deemed an employee welfare benefit plan").

Here, the record shows that the Defendant and Dwayne Samuels formed and operated Fidelity. Herzberg Aff. ¶ 5; Campbell Decl., Exh. G (Response to Notice to Admit, Nos. 5 and 6). The record further shows that the Defendant and Samuels were each fifty-percent shareholders of Fidelity, with Duncan serving as the President and Samuels as the Vice President of Fidelity. Herzberg Aff. ¶ 5; Campbell Decl. ¶ 67. The Defendant was in charge of marketing Fidelity's services, and Samuels was in charge of its operations. Herzberg Aff. ¶ 5. Fidelity processed the "claims of the employees of its employer-members." *Id.* ¶ 6.

The record also shows that the Plan had a series of accounts that were under the control of four trustees. Campbell Decl. ¶¶ 19–21, 23, and Exh. G (Responses to Notice to Admit, Nos. 1–4). The Plan was administered by Fidelity from June 1, 1996, to December 15, 1998, when a temporary restraining order was entered by the District Court against several individuals, including the Defendant. Campbell Decl. ¶¶ 36–37 and Exh. G (Response to Notice to Admit, No. 14); Campbell Decl. ¶ 3 and Exh. B (Temporary Restraining Order).

Employers seeking to enroll employees in the Plan were required to join the National Association of Business Owners and Professionals ("NABOP"), and employees seeking to participate in the Plan were required to join the International Workers Guild ("IWG"). Campbell Decl. ¶¶ 51–52 and Exh. G (Responses to Notice to Admit, Nos. 68–70). Fidelity sent invoices to employers purchasing health care coverage which called for the payment of Plan contributions (labeled as "Benefit Trust" or "Trust Fee"), NABOP fees (labeled as "ASSN."), and union fees (labeled as "IWA ASSN"). Campbell Decl. ¶¶ 40, 42, and Exh. J (Fidelity invoice dated April 1, 1997, to Leggett Motor Rebuilding). Employers remitted payments to Fidelity for the total amount, without distinguishing among the contributions and fees. Campbell Decl. ¶ 41 and Exh. G (Response to Notice to Admit, No. 21).

The record further shows that Fidelity deposited the checks that it received from employers in a single disbursement account at North Fork Bank. Campbell Decl. ¶ 43 and Exh. G (Response to Notice to Admit, No. 22). Fidelity then transferred those funds to accounts in the names of NABOP, IWG, and the Plan. Campbell Decl. ¶ 44 and Exh. G (Response to Notice to Admit, No. 23). Fidelity drew its own fees, expenses, and compensation directly from the Plan account at North Fork Bank. Campbell Decl. ¶ 45 and Exh. G (Response to Notice to Admit No. 24).

The Secretary argues that the Consent Judgment Debt arose in connection with an express or technical trust for at least two reasons. Pl. S.J. Br. at 10–11. First, she asserts that the Defendant admitted in the Consent Judgment that:

> [the Plan] provided group health and welfare benefits to the employees of contributing employers, and constituted 'employee welfare benefit plan(s)' within

the meaning of ERISA Section 3(a), 29 U.S.C. § 1002(1), which are subject to the coverage of ERISA pursuant to ERISA § 4(a), 29 U.S.C. § 1003(a).

Campbell Decl., Exh. F at 2 (Consent Judgment). *See also* Pl. S.J. Br. at 10–11.

Second, the Secretary argues that apart from the Defendant's admissions in the Consent Judgment, the record shows that the Plan was an ERISA plan, and therefore an express or technical trust. Pl. S.J. Br. at 11. The Plan's Trust Agreement (the "Trust Agreement") describes it as a collectively-bargained ERISA welfare benefit plan. Campbell Decl., Exh. P at 1 (Trust Agreement). In particular, the record shows that IWG and NABOP entered into the Trust Agreement requiring the parties to establish a "jointly administered employee welfare benefit plan ('Plan') to provide for its participants or beneficiaries medical, surgical, or hospital care or benefits and any other benefit permitted by Title I Section 3 of the Employee Retirement Income Security Act of 1974." Campbell Decl. ¶ 60. *See* Campbell Decl., Exh. P (Trust Agreement). The Trust Agreement further provides that employees would "contribute to an employee welfare benefit plan, thereby making the plan a multi-employer plan under Section 3(37A) of ERISA." *Id.*

■ As to the Secretary's first argument, principles of res judicata dictate that the Defendant's admission in the Consent Judgment that the Plan was an employee welfare benefit plan under ERISA should not be re-examined by this Court. *See Duncan*, 308 B.R. at 149. The Defendant did not enter into the Consent Judgment without advice or the opportunity to consider its significance and potential consequences. Rather, he was represented by counsel and agreed to the admissions of his own accord. *See* Campbell Decl., Exh. F at 4 (Consent Judgment).

■ As to the Secretary's second argument, and in all events, the requirements that employers enroll in NABOP, and employees enroll in IWG, as well as the employers' payment of fees to the Plan, show that the Plan was within the scope of an ERISA employee benefit welfare plan. *See* p. 79, *supra.* For these reasons, and consistent with the broad meaning accorded to "employee welfare benefit plans" by courts that have considered the issue, this Court finds that the Plan is an "express or technical trust," and thus the first element of a nondischargeability action under Section 523(a)(4) is met.

B. *Whether the Defendant acted in a fiduciary capacity with respect to the trust*

■ The second element of a nondischargeability action under Section 523(a)(4) is whether the Debtor acted in a fiduciary capacity with respect to the trust. *In re Zoldan,* 226 B.R. at 772. "The meaning of a fiduciary is a matter of federal law," but "[t]he broad, general definition of fiduciary, involving confidence, trust, and good faith, is not applicable in dischargeability proceedings under § 523(a)(4)." *Id.*

ERISA defines "fiduciary" in expansive terms:

[A] person is a fiduciary with respect to a plan to the extent (i) he [or she] exercises *any* discretionary authority or discretionary control respecting management of such plan or exercises *any* authority or control respecting management or disposition of its assets ... or (iii) he [or she] has *any* discretionary authority or discretionary responsibility in the administration of the plan.

29 U.S.C. § 1002(21)(A) (emphasis added). The Supreme Court has described ERISA's definition of a fiduciary "not in terms of formal trusteeship, but in *func-* *tional* terms of control and authority over the plan." *Mertens v. Hewitt Assocs.,* 508 U.S. 248, 262, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993) (emphasis in the original).

The Second Circuit has interpreted ERISA's definition of a fiduciary as functional and concerned with the nature of the duties performed, rather than the title held, by an individual. For example, in *LoPresti v. Terwilliger,* the Second Circuit found that a company's president and fifty-one percent shareholder was an ERISA fiduciary because he had a role in determining which bills to pay, which creditors were to be paid out of the company's general account, and when those creditors would be paid. *LoPresti v. Terwilliger,* 126 F.3d 34, 40 (2d Cir.1997). As the court observed, "fiduciary status may result from the exercise of any authority or control respecting management or disposition of [plan] assets." *Id. See also Blatt v. Marshall and Lassman,* 812 F.2d 810, 812–13 (2d Cir.1987) (finding that defendants were ERISA fiduciaries under a functional definition because they exercised actual control over plan assets).

Other courts have reached similar conclusions. *See, e.g., Donovan v. Mercer,* 747 F.2d 304, 308 (5th Cir.1984) (defining fiduciary by reference not only to titles but also to extent of authority over employee benefit plan); *Liss v. Smith,* 991 F.Supp. 278, 302 (S.D.N.Y.1998) (the "definition of a fiduciary is functional and focuses on the nature of the duties performed rather than the title held by an individual"). "The definition ... encompasses a variety of duties commonly performed by fiduciaries, including the providing of investment advice, administrative control over a plan, advising on whom to retain as legal or investment advisors to a plan, and ultimately, how to invest plan assets." *Navarre v. Luna (In re Luna),* 406 F.3d 1192, 1201 (10th Cir.2005).

Courts have reached different conclusions on whether the determination that an individual is a fiduciary for ERISA purposes necessarily means that the individual acted in a fiduciary capacity for purposes of Section 523(a)(4).

In *In re Hemmeter*, the Ninth Circuit concluded that ERISA plan fiduciaries are always fiduciaries for purposes of Section 523(a)(4) because "ERISA satisfies the traditional requirements for a statutory fiduciary to qualify as a fiduciary under § 523(a)(4)." *Blyler v. Hemmeter (In re Hemmeter)*, 242 F.3d 1186, 1190 (9th Cir. 2001). The court observed that as early as 1844, "courts have construed 'fiduciary' in the bankruptcy discharge context as including express trusts, but excluding trusts *ex maleficio, i.e.,* trusts that arose by operation of law upon a wrongful act." *Id.* at 1189 (citing *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333, 55 S.Ct. 151, 79 L.Ed. 393 (1934); *Chapman v. Forsyth,* 43 U.S. (2 How.) 202, 208, 11 L.Ed. 236 (1844)). The court found that a statutory fiduciary will be a fiduciary for Section 523(a)(4) purposes if the statute defines the trust *res,* identifies the fiduciary's duties, and imposes obligations on the fiduciary before the alleged wrongdoing. *In re Hemmeter,* 242 F.3d at 1190. Because ERISA incorporates all of these requirements, the court reasoned, an ERISA fiduciary necessarily qualifies as a Section 523(a)(4) fiduciary. *Id.*

Other courts have reached the same conclusion and determined that an ERISA fiduciary will always be a fiduciary for purposes of Section 523(a)(4). *See, e.g., Eavenson,* 243 B.R. at 160 ("[a]n ERISA fiduciary, under the obligation to satisfy his corresponding fiduciary duties . . . acts in a 'fiduciary capacity' under § 523(a)(4)."); *Weaver v. Weston (In re Weston),* 307 B.R. 340, 343 (Bankr.D.N.H. 2004) ("the . . . conclusion that the Defen-

dant was an ERISA fiduciary, under the obligation to discharge his fiduciary duties, satisfies the requirement that the Defendant was 'acting in a fiduciary capacity' under § 523(a)(4)."); *In re Eisenberg,* 189 B.R. at 730 (the debtor's admission that he acted "in a fiduciary capacity with respect to the ERISA plan and the plan beneficiaries" satisfied the fiduciary element of Section 523(a)(4)); *Morgan v. Musgrove (In re Musgrove),* 187 B.R. 808, 814 (Bankr. N.D.Ga.1995) ("one who qualifies as an ERISA 'fiduciary' also should fall within the type of 'fiduciary' contemplated by Bankruptcy Code section 523(a)(4).")

A different path was followed by the Eighth Circuit in *Hunter v. Philpott,* 373 F.3d 873 (8th Cir.2004). There, the debtor, Philpott, was the co-owner of a corporation that failed to make contributions to certain employee benefit funds pursuant to a collective bargaining agreement. The funds sought a determination that Philpott's obligations to the funds were nondischargeable under Section 523(a)(4), arguing that in failing to make the required contributions, Philpott "committed defalcation of the Funds' property while serving in a fiduciary capacity." *Id.* at 875. Distinguishing *In re Hemmeter,* the court found:

> We are not satisfied that the simple determination that an individual is an ERISA fiduciary is enough to satisfy the requirements of § 523(a)(4). Instead, we believe that the prior holdings of our court and the United States Supreme Court require that we look specifically at the property that is alleged to have been defalcated to determine whether [the debtor] was legally obligated to hold that specific property for the benefit of the [trust].

*Hunter,* 373 F.3d at 875. The court observed that the debtor was not personally a party to the contract that allegedly gave

rise to the fiduciary relationship, and concluded that "the substance of the relationship between [the debtor] individually and the Funds was basically contractual, not fiduciary, in nature." *Id.* at 877. For that reason, the court continued, "[i]n the § 523(a)(4) context, the fiduciary relationship must preexist 'the incident creating the contested debt and apart from it. It is not enough that the trust relationship spring from the act from which the debt arose.'" *Id.* (quoting *In re Dloogoff,* 600 F.2d 166, 168 (8th Cir.1979)). *See also In re Luna,* 406 F.3d at 1205 (citing *Hunter,* in bankruptcy case arising from same collective bargaining agreement brought by same plaintiffs, "a delinquent employer-contributor [to a collectively-bargained ERISA plan] is merely a debtor, not a fiduciary.")

Other courts have similarly concluded that ERISA fiduciaries do not necessarily act in a fiduciary capacity for purposes of Section 523(a)(4). *See, e.g., Bowman v. Hollander (In re Hollander),* 1992 WL 373172, at *3 (N.D.Ohio 1992) ("The court must keep in mind that for purposes of § 523(a)(4), it is insufficient, without more, that the statute relied upon by claimants creates a fiduciary obligation simply for the purposes of that statute."); *Schrimsher v. Nielsen (In re Nielsen),* 53 B.R. 289, 291 (Bankr.N.D.Ala.1985) (noting that "[e]nforced use of [Congress's] definitions is generally limited to specified statutes" and concluding that in all events, the debtor was not an ERISA fiduciary); *Int'l Bhd. of Elec. Workers, Local Union No. 602 v. Bryant (In re Bryant),* 73 B.R. 956, 958–59 (Bankr.N.D.Tex.1987) ("The fact that [ERISA] makes an employer a 'fiduciary' under an Employee Welfare Benefit Plan, does not raise the employer's status to a fiduciary for bankruptcy discharge purposes.").

■ The Second Circuit has not addressed whether ERISA fiduciary status will always satisfy Section 523(a)(4)'s fiduciary capacity requirement. At the outset, it is routine to give meaning to Bankruptcy Code terms by reference to non-bankruptcy law. For example, the Court may look to applicable non-bankruptcy law to determine property rights in the assets of a Debtor's estate. *See Butner v. United States,* 440 U.S. 48, 48–49, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); 5 COLLIER ON BANKRUPTCY ¶ 541.05 (15th ed. rev.2005). And in the Section 523(a)(4) context, it seems reasonable and appropriate to look to ERISA's definition of a fiduciary in order to assess whether the requirement of fiduciary capacity has been met. This does not mean that every debt arising from or related to an ERISA violation by an ERISA fiduciary will be excepted from discharge by Section 523(a)(4). But where the debt arises from an ERISA fiduciary acting in his or her fiduciary capacity under the statute, then Section 523(a)(4)'s requirement that the debtor act in a fiduciary capacity will be met.

The Secretary argues that the Defendant was acting in a fiduciary capacity in relation to the Consent Judgment Debt in several ways. First, the Secretary argues that the Defendant acted in a fiduciary capacity by exercising control over Plan assets as an executive at Fidelity and by authorizing the payment of claims and the transfer of funds. The Secretary notes that the Defendant was President and fifty-percent owner of Fidelity, and Fidelity administered the Plan and the related bank accounts. Pl. S.J. Br. at 19; Campbell Decl. ¶¶ 25, 37, 43–45, 67, 68, and Exh. G (Response to Notice to Admit, No. 5). The Secretary further notes that the Defendant, together with Samuels, Fidelity's Vice President, and David Spooner, Fidelity's Chief Financial Officer, initiated check payments and transfers involving Plan as-

sets. Pl. S.J. Br. at 19; Campbell Decl. ¶ 69 and Exh. G (Response to Notice to Admit, No. 32). The Secretary points out that the Defendant authorized transfers of money from the Plan to Fidelity, IWG, and NABOP, and authorized the payment of claims submitted to the Plan. Pl. S.J. Br. at 19; Campbell Decl. ¶¶ 70, 71, and Exh. G (Response to Notice to Admit, No. 74).

The Secretary next argues that the Defendant acted in a fiduciary capacity when he played a role in determining the fees paid by the Plan to Fidelity. Pl. S.J. Br. at 19–21. The Secretary argues that the Defendant helped determine the terms of the Administrative Services agreements, and that these agreements were not negotiated at arm's-length due to the interlocking relationships among the officers and directors of Fidelity and the Plan. *Id.* In support of her argument, the Secretary points to the fact that the Defendant admitted that he determined or helped to determine the amount of fees that Fidelity took from the Plan from month to month. Campbell Decl. ¶ 72 and Exh. G (Response to Notice to Admit, No. 80). The Secretary notes that between June 1, 1996, and October 2, 1998, Fidelity and the Plan entered into three different agreements concerning Fidelity's fees. Pl. S.J. Br. at 20; Campbell Decl. ¶¶ 61–66, Exh. Q (Administrative Services Agreement dated June 1, 1996 ("1996 ASA")), Exh. R (Administrative Services Agreement dated April 7, 1997 ("1997 ASA")), and Exh. S (Administrative Services Agreement dated October 2, 1998 ("1998 ASA")). The 1996 ASA provided that Fidelity could charge the Plan "at cost up to 38%" in administrative fees for the first "9999 members." Campbell Decl., Exh. Q (1996 ASA). The 1997 ASA provided that Fidelity could charge the Plan "$45 per enrolled employee, per month; after termination of this Agreement: 15% of claims paid." Campbell Decl., Exh. R (1997 ASA). The 1998 ASA provided that Fidelity could charge the Plan "Administrative fees during the term of this Agreement: January 1, 1997–March 31, 1999—19% of cash contribution income." Campbell Decl., Exh. S (1998 ASA).

In response, the Defendant argues that a finding that an individual acted in a fiduciary capacity requires " 'clear and explicit evidence of an [individual] defendant's intent to add personal liability to the liability of the entity,' " or a contract provision expressly providing for such liability, and that neither is present here. *Mingoia v. American Lath & Plaster Co.,* 2004 WL 2782010, at *3 (S.D.N.Y. Dec.2, 2004) (quoting *Mason Tenders Dist. Council Welfare Fund v. Thomsen Constr. Co.,* 301 F.3d 50, 53 (2d Cir.2002)). *See* D. Opp. Br. at 14. But neither the scope of ERISA's definition of a fiduciary nor the parameters of Section 523(a)(4)'s exception to discharge is limited in the way that the Defendant suggests, for several reasons.

First, *Mingoia* addresses a different ERISA section which serves a different purpose. *Mingoia,* 2004 WL 2782010, at *1. *Mingoia* was brought pursuant to ERISA Section 515, which regulates employers in their capacities as parties to collective bargaining agreements and contractual debt obligations, while the Secretary's action giving rise to the Consent Judgment Debt was brought pursuant to ERISA Section 409, which addresses fiduciary breaches. *See* 29 U.S.C. §§ 1109, 1145. *See also* Pl. Reply at 6–9. The enforcement mechanisms for each cause of action are separate and distinct. *Mingoia,* 2004 WL 2782010, at *1; Campbell Decl., Exh. A (District Court Complaint). *See also* Pl. Reply at 6–9. And ERISA precludes the Secretary from bringing Section 515 claims. *See* 29 U.S.C. § 1132(b)(2). *See also* Pl. Reply at 6–9.

Second, and more generally, an individual may act in a fiduciary capacity under ERISA in the absence of an express contractual provision. The substance, not the form, of the individual's activities will determine whether he or she has assumed a fiduciary's status under ERISA. *See* pp. 80–81, *supra.* And based on his or her functional responsibilities, an owner or executive of a third party administrator may be a fiduciary even if the entity itself is not a fiduciary. For example, as one court found, the chief executive officer and chair of the board of a third party administrator were fiduciaries of an ERISA plan for purposes of Section 523(a)(4) because they exercised control over plan assets and selected the plan's administrator, while the entity was not an ERISA fiduciary because it "provided nothing more than administrative support for the plan." *Chao v. Crouse,* 346 F.Supp.2d 975, 983 (S.D.Ind.2004). *See also* Pl. Reply at 3.

The Defendant also argues that he did not act in a fiduciary capacity because he did not exercise discretionary authority or control over the management or administration of the Plan or the disposition of Plan assets. D. Opp. Br. at 8–10. The Defendant states that the terms of the Administrative Services Agreement between Fidelity and the Plan show that neither he nor Fidelity had control or authority over the administration or assets of the Plan, and therefore, that he was not a fiduciary of the Plan. D. Opp. Br. at 8–9. The Administrative Services Agreement cited by the Defendant provides that, as "Claims Administrator," Fidelity:

is only authorized to act on behalf of the Fund in connection with the administration of the Group Health Plan to the extent expressly stated herein, and to the extent necessary to effectuate the intent of this Agreement, and as mutually agreed upon by the parties in writing.

Furthermore, it is understood and agreed by the parties that the Claims Administrator is only obligated to provide the specific services described in the Agreement ... Pursuant to ERISA, the Claims Administrator is considered a fiduciary of the Employee Welfare Benefit Plan for the limited extent of its contractual obligation to administer claims.

D. Opp. Br. at 8–9 and Exh. S (1998 ASA ¶ I(C)).

The Defendant supports his argument that he had no discretionary authority or control over the management or administration of the Plan or the disposition of Plan assets by reference to minutes of meetings of the Plan's board of trustees. The minutes of the Plan's October 16, 1998, board meeting show that the trustees would make the decision to terminate Fidelity's services if improvements were not made. D. Opp. Br. at 9 and Exh. E (minutes of October 16, 1998, Plan trustee meeting). The Defendant also observes out that the Plan trustees ultimately decided to terminate Fidelity as the third party administrator. D. Opp. Br., Exh. D (December 2, 1998, termination letter from Board of Trustees of Plan to Eugene Duncan).

The Defendant also argues that the relationships and roles of others to the Plan show that he was not a fiduciary of the Plan. First, the Defendant notes that he was not among the members of the Plan's board of trustees. D. Opp. Br. at 8. The Defendant states that he was not an employee or an officer of the Plan, but rather "the President, board of director member and 50% shareholder of Fidelity and Fidelity provided certain third party administrative services on behalf of the IWG Fund." *Id.* And the Defendant points out that he was not a named insured on the

Plan's Officers and Directors Insurance Policy ("D & O Policy"). D. Opp. Br. at 14–15 and Exh. H (Pension and Welfare Fund Fiduciary Responsibility Insurance Policy (State of New York)). The Defendant states that he did not ask to be named as an insured because the Plan trustees did not consider him to be a fiduciary of the Plan. D. Opp. Br. at 15.

The Defendant further argues that he was not acting in a fiduciary capacity because he did not ultimately determine fees or adjudicate claims. D. Opp. Br. at 12; D. Sur-reply at 2. The Defendant argues that the minutes of a December 2, 1997, Plan trustee meeting show that he did not participate in decisions to increase Fidelity's compensation, increase rates charged to members, or decrease benefits provided. D. Opp. Br. at 12 and Exh. A (minutes of December 2, 1997, Plan trustee meeting). Under a heading titled "Third–Party Administrator—Eugene Duncan," these minutes state:

> [A] benefit reduction of 12–15% coupled with an average 16% rate increase achieves our original objective of 30% ... It is anticipated that the rate increase will affect 6500 members by the end of 1998. The rate increase had to be staggered because we have companies who have fixed rate contracts for one year, but as we move forward, these new rates will be fixed.

D. Opp. Br. at 13 and Exh. A (minutes of December 2, 1997, Plan trustee meeting).

The Defendant also argues that the minutes of an October 16, 1998, Plan trustee meeting show that he did not act in a fiduciary capacity because he did not exercise control over the adjudication of claims. D. Opp. Br. at 12 and Exh. E (minutes of October 16, 1998, Plan trustee meeting). The Defendant states that Fidelity, through the Defendant, "made a full and fair disclosure of all pertinent information to the trustees of the IWG Fund and the trustees decided the specific [claim] matter, without a vote by Duncan." D. Opp. Br. at 13 and Exh. E (minutes of October 16, 1998, Plan trustee meeting).

▆▆▆ Here, the record shows, among other things, that the Defendant, as President of Fidelity, authorized transfers of funds from the Plan to Fidelity, IWG, and NABOP, and authorized payments on health care claims submitted to the Plan. *See* p. 82, *supra*. In addition, the record shows that the Defendant initiated check payments and transfers involving the Plan's assets. *See* p. 82, *supra*. The record also shows that the Defendant exercised discretion over fees paid to Fidelity by the Plan. *See* pp. 82–83, *supra*. These conclusions are not gainsaid by the instances identified by the Defendant where others may also have exercised discretion with respect to the Plan.

By authorizing transfers and payments of Plan funds, authorizing the payment of claims, and participating in the determination of fees to be paid by the Plan, the Defendant assumed the functions of an ERISA fiduciary. *See Mertens,* 508 U.S. at 262, 113 S.Ct. 2063; *LoPresti,* 126 F.3d at 40. In this way, the Defendant "exercised ... discretionary authority ... respecting management of such plan" and "respecting management or disposition of [its] assets." 29 U.S.C. § 1002(21)(A). These actions performed by a president and fifty-percent shareholder of the administrator of an ERISA plan have the "functional" markings of fiduciary responsibility. *See Mertens,* 508 U.S. at 262, 113 S.Ct. 2063; *LoPresti,* 126 F.3d at 40; *Blatt,* 812 F.2d at 813.

For these reasons, this Court finds that the Defendant acted in a fiduciary capacity with respect to the trust, and thus the

second element of a nondischargeability action under Section 523(a)(4) is met.

## C. Whether the Consent Judgment Debt arose from "defalcations" within the meaning of the Bankruptcy Code

■■■ The third element of a nondischargeability action under Section 523(a)(4) is whether the Consent Judgment Debt arose from a "defalcation" within the meaning of the Bankruptcy Code. Defalcation is not defined in the Bankruptcy Code, and courts have reached different conclusions as to whether conscious misconduct must be shown in order to establish that a debt arises from a defalcation for purposes of Section 523(a)(4). *See Samuels v. Ellenbogen (In re Ellenbogen)*, 218 B.R. 709, 711 (Bankr.S.D.N.Y.1998) ("There is apparent conflict among the federal decisions in the interpretation of defalcation.").[2]

The Second Circuit considered the meaning of defalcation in the context of bankruptcy discharge nearly seventy years ago in *Central Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510 (2d Cir.1937). There, the court observed that "[w]hatever was the original meaning of 'defalcation,' it must have covered other defaults than deliberate malversations, else it added nothing to the words, 'fraud or embezzlement.'" *Central Hanover Bank & Trust Co.*, 93 F.2d at 511. The court concluded:

> Although [misappropriation] probably carries a larger implication of misconduct than "defalcation," "defalcation" may demand some portion of misconduct; we will assume arguendo that it does.
>
> All we decide is that when a fiduciary takes money upon a conditional authority which may be revoked and knows at

the time that it may, he is guilty of a "defalcation" though it may not be a "fraud," or an "embezzlement," or perhaps not even a "misappropriation."

*Id.* at 512. *See also In re Hayes*, 183 F.3d at 171–72 (noting that "authorities are divided on the extent of misconduct, if any, that is required," and concluding that the issue need not be decided because "assuming ... that defalcation demands 'some portion of misconduct,'" the debtor committed a defalcation).

More recently, bankruptcy courts in this Circuit have considered the scope of defalcation for purposes of Section 523(a)(4), and concluded that the boundaries of this term encompass more than fraud, embezzlement, and misappropriation, but do not reach so far as negligence. For example, in *Adamo v. Scheller (In re Scheller)*, 265 B.R. 39 (Bankr.S.D.N.Y.2001), the court found that "[w]hile something more than mere negligence by a fiduciary is required, a defalcation need not rise to the level of fraud, embezzlement, or misappropriation." *Scheller*, 265 B.R. at 53.

Similarly, in *In re Ardito*, this court found:

> Defalcation ... [is] broader than fraud, embezzlement, or misappropriation, *Central Hanover Bank & Trust v. Herbst*, 93 F.2d 510 (2d Cir.1937). It has been held that debts are non-dischargeable where there has been a "failure to meet an obligation; misappropriation of trust funds or money held in a fiduciary capacity; and failure to properly account for such funds." *In re Kleppinger*, 27 B.R. 530, 532 (Bankr. M.D.Pa.1982). In addition, it has been held that an objective standard is ap-

---

**2.** BLACK's LAW DICTIONARY reflects this range of views, offering definitions of "defalcation" as "embezzlement," "[l]oosely, the failure to meet an obligation; a non-fraudulent default," and "[a] deduction; a set-off." BLACK's LAW DICTIONARY 448 (8th ed.2004).

plied, that neither malicious intent nor even bad faith need be proven; therefore a defalcation may be found where there has been a diminution, abatement or deficit in an account as a result of a mistake or negligence in addition to misconduct.

*In re Ardito*, 1988 WL 324200, at *3 (Bankr.E.D.N.Y.1988).

After a thorough consideration of the authorities, the court in *In re Ellenbogen* recognized that "[t]he word 'defalcation,' in ordinary and customary usage, undoubtedly connotes some element of misconduct beyond mere negligence" and concluded:

[M]ere negligence, without some element of intentional wrongdoing, breach of fiduciary duty or other identifiable misconduct, does not constitute "defalcation" within the meaning of section 523(a)(4). This result accords with customary principles of statutory interpretation and with the overarching objectives of the Bankruptcy Code.

*In re Ellenbogen*, 218 B.R. at 716. *See also Denton v. Hyman (In re Hyman)*, 320 B.R. 493, 506 (Bankr.S.D.N.Y.2005) (the "term 'defalcation' as used in Section 523(a)(4) demands 'some portion of misconduct' on the part of a fiduciary."); *In re Zoldan*, 226 B.R. at 777–78 ("While defalcation may not require actual intent, nor may it rise to the level of misappropriation, it does require some level of mental culpability.... [D]efalcation is 'willful neglect,' essentially a standard of recklessness or at least gross negligence.").

■ At a minimum, a defalcation for purposes of Section 523(a)(4) must arise from conduct that justifies the substantial penalty of denial of dischargeability of the Consent Judgment Debt. This penalty is not lightly to be invoked, as it is widely recognized that exceptions to discharge are narrowly construed. Indeed, as the court observed in *In re Ellenbogen*, "non-

dischargeability is 'perceived to be a punitive exception to the "fresh start" policy and should be found reluctantly.' " *In re Ellenbogen*, 218 B.R. at 717 (quoting *Matter of Martonak*, 67 B.R. 727, 728 (Bankr. S.D.N.Y.1986)). Not every debt incurred by a fiduciary may arise as a result of a defalcation, but where the debt arises as a result of conscious misconduct or breach of the duty giving rise to the debtor's fiduciary status, the defalcation element of Section 523(a)(4) will be satisfied.

Several ERISA provisions bear upon whether the Secretary has satisfied the defalcation element of her Section 523(a)(4) claim. ERISA Section 404(a) sets forth the fundamental requirements of loyalty and prudence of a trustee. Section 404(a)(1) requires a fiduciary to act "solely in the interest of the participants and beneficiaries" of the plan. 29 U.S.C. § 1104(a)(1). Courts have described this duty as:

the duty to act with "complete and undivided loyalty to the beneficiaries," *Freund v. Marshall & Ilsley Bank*, 485 F.Supp. 629, 639 (W.D.Wis.1979), and with an "eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir.), *cert. denied*, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982).

*Donovan v. Walton*, 609 F.Supp. 1221, 1228 (S.D.Fla.1985).

More generally, and as the Supreme Court has observed in the ERISA context:

Under principles of equity, a trustee bears an unwavering duty of complete loyalty to the beneficiary of the trust, to the exclusion of the interests of all other parties. RESTATEMENT (SECOND) OF TRUST § 170(1) (1957); 2 A. Scott, LAW OF TRUSTS § 170 (1967). To deter the trustee from all temptation and to prevent any possible injury to the beneficiary,

the rule against a trustee dividing his loyalties must be enforced with "uncompromising rigidity." *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545, 546 (Cardozo, C.J.). A fiduciary cannot contend "that, although he had conflicting interests, he served his masters equally well or that his primary loyalty was not weakened by the pull of his secondary one." *Woods v. City National Bank & Trust Co.*, 312 U.S. 262, 269, 61 S.Ct. 493, 497, 85 L.Ed. 820.

*NLRB v. Amax Coal Co.*, 453 U.S. 322, 329–30, 101 S.Ct. 2789, 69 L.Ed.2d 672 (1981).

ERISA also requires fiduciaries to act with the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B). ERISA's duty of prudence requires that fiduciaries consider the merits of a transaction, and make a careful, reasoned assessment of other alternatives. *Whitfield v. Tomasso*, 682 F.Supp. 1287, 1301 (E.D.N.Y.1988). Also, "[t]his charge imposes an unwavering duty on an ERISA trustee to make decisions with single-minded devotion to a plan's participants and beneficiaries, and, in so doing, to act as a prudent person would act in a similar situation." *Morse v. Stanley*, 732 F.2d 1139, 1145 (2d Cir.1984).

ERISA Section 406(a) generally prohibits transactions between a plan and a party in interest. 29 U.S.C. § 1106(a). The purpose of this Section is "to insure arm's-length transactions by [plan] fiduciaries" (*M & R Inv. Co. v. Fitzsimmons*, 685 F.2d 283, 287 (9th Cir.1982)), and "to minimize conflicts-of-interest among trustees, plan members and third parties" (*Donovan v. Walton*, 609 F.Supp. at 1229). ERISA Section 406(a)(1) "supplements the fiduciary's general duty of loyalty to the plan's beneficiaries, § 404(a), by categorically barring certain transactions deemed 'likely to injure the pension plan.'" *Harris Trust and Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241–42, 120 S.Ct. 2180, 147 L.Ed.2d 187 (2000) (quoting *Comm'r v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 160, 113 S.Ct. 2006, 124 L.Ed.2d 71 (1993)). ERISA defines a "party in interest" to include any corporation of which "50 percent or more" of the total "capital interest or profits interest of such partnership" is owned by, among others, any fiduciary. 29 U.S.C. § 1002(14)(G). ERISA also provides that a "party in interest" includes any "fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian), counsel, or employee of such employee benefit plan." 29 U.S.C. § 1002(14)(A). And ERISA Section 3(14)(B) also defines as a party in interest any "person providing services" to an employee welfare benefit plan. 29 U.S.C. § 1102(14)(B).

ERISA Section 406(b) generally prohibits self-dealing by fiduciaries. Under this Section, fiduciaries may not deal with plan assets in their own interest or for their own accounts (29 U.S.C. § 1106(b)(1)); may not act on behalf of a party whose interests are adverse to the plan (29 U.S.C. § 1106(b)(2)); and may not receive consideration for their own accounts from any party dealing with the plan involving the plan's assets (29 U.S.C. § 1106(b)(3)). As with Section 406(a), the prohibition against self-dealing serves to assure arm's-length transactions by, and minimize conflicts of interest of, plan fiduciaries. *See Donovan v. Walton*, 609 F.Supp. at 1229. Bad faith is not an element of a Section 406(b) violation. Rather, "even in the absence of bad faith, or in the presence of a fair and reasonable transaction, § 1106(b) establishes a blanket prohibition of certain acts, easily applied, in order to facilitate

Congress' remedial interests in protecting employee benefit plans." *Gilliam v. Edwards,* 492 F.Supp. 1255, 1263 (D.N.J. 1980). *See Reich v. Goldstein (In re Consol. Welfare Fund ERISA Litigation),* 839 F.Supp. 1068, 1073–74 (S.D.N.Y.1993) (finding that the owner of a company violated ERISA Section 406(b) by deducting his own fees and commissions from employer contributions to the plan).

The Secretary contends that NABOP and IWG were "instrumentalities of a group of friends and relatives, of which the Defendant was a leading member," and existed only to receive fees from the Plan. Pl. S.J. Br. at 23.

The record shows that the Defendant and Samuels were the original and equal owners of NABOP. Campbell Decl. ¶¶ 28, 29, and Exh. G (Responses to Notice to Admit, Nos. 10 and 11). The record also shows that the Defendant and Samuels transferred ownership of NABOP to Terence Rhue, another Plan trustee, "sometime" before the Secretary began the District Court Action against the Defendant. Campbell Decl. ¶ 29 and Exh. G (Response to Notice to Admit, No. 11). In addition, the record shows that one trustee, Charles Bradley, was the Defendant's half-brother, that another trustee, Paul Askew, was married to Samuels' sister, and that Samuels' sister was Fidelity's manager of human resources. Campbell Decl. ¶¶ 22–24 and Exh. G (Responses to Notice to Admit, Nos. 4, 12, 13). The record also shows that in 1997, NABOP paid $72,850 in compensation to the Defendant and $53,082.84 in compensation to Yvonne Duncan, the Defendant's wife. Campbell Decl., Exh. AA (1997 1099 form for Eugene Duncan and 1997 W–2 form for Yvonne Duncan). The record further shows that NABOP and Fidelity operated out of the same building in Great Neck, New York. Campbell Decl. ¶ 105 and Exhs. J, N, O, W, AA

(Fidelity invoices and check and NABOP letterhead listing 1010 Northern Boulevard, Great Neck, NY, 11021, as the mailing address for each entity).

The Secretary also argues that NABOP was not a legitimate employer entity, and that employers who became members of NABOP were not brought in contact with the Plan through a collective bargaining process. Pl. S.J. Br. at 25. The record shows that employer members were contacted to enroll in the Plan by sales agents who received commissions for each new employer whom they successfully recruited. Campbell Decl. ¶¶ 98–99 and Exhs. G (Response to Notice to Admit, No. 31), and Z (list of 1997 commissions paid by Fidelity to sales agents).

The Secretary further argues that IWG was not a legitimate employee entity and, like NABOP, existed solely for the purpose of receiving fees from the operation of the Plan. Pl. S.J. Br. at 24. The Secretary notes that the Defendant's counsel argued that "the Fidelity, NABOP, IWG was not an employee organization as it was not formed by the employees, nor were its members employees." Campbell Decl. ¶ 33 and Exh. I at 39 (December 8, 2003, hearing transcript). The Secretary also notes that Defendant's counsel acknowledged that "there was never an employee organization as that term is defined" and that "neither Fidelity, NABOP, and/or [IWG] was an employer." Campbell Decl. ¶¶ 34, 35, and Exh. I at 41–42 (December 8, 2003, hearing transcript). The record shows that IWG's members were not drawn from a particular trade or craft. Campbell Decl. ¶¶ 47–48 and Exh. K (Fidelity employer census).

The Secretary states that IWG and NABOP received substantial amounts of money that Fidelity collected from participating employers and, in turn, paid to IWG and NABOP. Pl. S.J. Br. at 26–27. The

record shows that Fidelity, as the third party administrator, collected up to $12 per participant from employers for IWG fees, and that NABOP received fees of first $12 and then $40 and $60 per participant. Campbell Decl. ¶¶ 75, 77, and Exh. G (Response to Notice to Admit, No. 25). The record also shows that in 1997, Fidelity transferred $1,767,022.63 to NABOP and $652,994.59 to IWG. Campbell Decl. ¶¶ 94, 95, and Exh. X (1997 Fidelity journal entries). The record shows that for six of the twelve months of 1997 and four of the first eight months of 1998, the Plan had negative net revenues. Campbell Decl. ¶ 81 and Exh. Y (March 28, 1998, letter from the Defendant to Investigator Michael Marino, U.S. Department of Labor, providing information on total value of outstanding claims for the Plan; Fidelity claims inventory report dated March 27, 1998). And the record shows that the Defendant reported a backlog of unpaid claims requiring adjudication of as much as $8.5 million. *Id.*

The Secretary asserts that in addition to the amounts that it collected and passed along to Fidelity and IWG, Fidelity also collected excessive administrative fees from the Plan. Pl. S.J. Br. at 26. The record shows that from January 1997 to August 1998, the Plan generated $24,306,413.94 in revenue, and that Fidelity received $6,946,600, or 28.5 percent of this amount, in fees. Campbell Decl., Exh. T (1997 Fidelity Fee Arrangement and Allocation). The record also shows that in the District Court Action, the court-appointed independent fiduciary stated that the "industry norm" for such administrative fees is 8 to 15 cents per dollar contributed to a health plan. Campbell Decl. ¶ 8 and Exh. D at 2 (January 21, 1999, letter from David K. Silverman, Esq., Independent Fiduciary, to Hon. Jacob Mishler).

The Secretary argues that the fees paid to Fidelity contributed to the Plan's inability to pay claims for its members' medical services. Pl. S.J. Br. at 29. The record shows that as of March 27, 1998, the Plan had a substantial backlog of unpaid medical claims, totaling $8,574,620.04. Campbell Decl. ¶¶ 96–97 and Exh. Y (March 28, 1998, letter from the Defendant to Investigator Michael Marino, U.S. Department of Labor, providing information on total value of outstanding claims for the Plan; Fidelity claims inventory report dated March 27, 1998).

The record shows that Buchbinder Tunick & Company LLP ("Buchbinder Tunick"), independent certified public accountants hired to audit the Plan's financial statements, reported in Notes to Financial Statements December 31, 1997 and 1996 (dated October 8, 1998) (the "Audit Report") that "[d]uring the years ended December 31, 1997, and 1996, the [Plan] engaged in various transactions with parties-in-interest, some of which may be deemed to be prohibited transactions according to the provisions of ERISA and the Internal Revenue Code." Campbell Decl. ¶¶ 82, 83, and Exh. U (Audit Report p. 10). The record also shows that in 1996 and 1997, Fidelity failed to remit a total of $1,413,023 in employer contributions to the Plan in a timely manner. Campbell Decl. ¶¶ 84–85 and Exh. U (Audit Report p. 11). The Audit Report further stated that the Plan overpaid administrative fees to Fidelity in the amounts of $183,609 for 1996 and $867,060 for 1997, and that Plan funds were used to pay NABOP expenses so that as of December 31, 1997, NABOP owed $107,231 to the Plan. Campbell Decl. ¶¶ 86–88 and Exh. U (Audit Report p. 11). Finally, the Audit Report stated that the Plan had a substantial excess of liabilities over assets available to pay claims despite high administrative fees paid to the Plan from Fidelity, and questioned the Plan's

ability to continue its operations. Campbell Decl. ¶¶ 89, 90, and Exh. U (Audit Report pp. 10–11).

The Secretary argues that in addition to mismanaging Fidelity's funds and creating a backlog of unpaid medical claims, the Defendant used funds from Fidelity's accounts for personal expenses, including expenses associated with his personal financial planning. Pl. S.J. Br. at 30. The record shows that the Defendant and Samuels used funds from Fidelity's operating account to look into establishing off-shore trust accounts for themselves and their families. Campbell Decl. ¶¶ 91–92, Exh. V (Consulting Agreement between Trustcorp and Mercantile Bancorp International setting compensation, performance dates, and action requested), and Exh. W (Fidelity Group, Inc. Operating Account checks dated July 31, 1997, and September 15, 1997, in the amount of $ 10,000 each, dated October 14, 1997, in the amount of $20,000, and dated May 13, 1997, in the amount of $875).

Taken as a whole, the record shows that there is no genuine issue of material fact as to whether the Defendant violated ERISA Section 404(a)(1)(A). This section provides that a fiduciary must act "solely in the interest of the participants and beneficiaries" of the plan, and "for the exclusive purposes of providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a)(1)(A). *See* p. 87, *supra.*

Here, the record shows, among other things, that Fidelity transferred substantial sums to NABOP and IWG. The record also shows that NABOP and IWG held themselves out as authentic entities, but that the employer-members of NABOP were not brought together through a genuine collective bargaining process but rather through commissioned sales agents, and that IWG was not comprised of workers from any particular trade. Rather, the record shows that there were close relationships between the Defendant and Samuels, on the one hand, and the principals of NABOP and IWG, on the other hand, and that the Defendant himself owned NABOP before transferring ownership of that entity to Rhue, one of the Plan trustees. While Fidelity paid NABOP and IWG more than $2 million from Plan assets in 1997, the Plan had significant negative net revenues for six months in 1997 and four of the first eight months in 1998. The Plan was unable to pay the claims of its participants and employees. *See* p. 90 *supra.*

The Defendant's mismanagement of the Plan caused a backlog of unpaid claims requiring adjudication, and ultimately, an inability to pay claims, thus violating the duty that fiduciaries have to act "with complete and undivided loyalty to the beneficiaries." *See Donovan v. Walton,* 609 F.Supp. at 1228. Based on the entire record, the Court concludes that the Defendant violated Section 404(a)(1)(A) by failing to act "solely in the interest of the participants and beneficiaries of the plan." 29 U.S.C. § 1104(a)(1)(A).

Taken as a whole, the record shows that there is no genuine issue of material fact as to whether the Defendant violated ERISA Section 404(a)(1)(B). This section provides that a fiduciary must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B). *See* p. 88, *supra.*

Here, the record shows, among other things, that the Defendant, as the President and fifty-percent owner of Fidelity, made payment decisions about the Plan's assets that resulted in large payments to NABOP, IWG, and Fidelity but a shortage

of funds to pay the backlog of medical claims. The record also shows that Buchbinder Tunick, the Plan's independent certified public accountants, noted the mismanagement of Plan assets, finding that Fidelity received overpayments of administrative fees and that Fidelity used Fund assets to pay NABOP expenses. *See* p. 91, *supra.*

By misusing the Plan's assets, the Defendant violated his duty to exercise care and consider the merits of a transaction or make a reasoned assessment of other alternatives. *Whitfield,* 682 F.Supp. at 1301. Based on the entire record, the Court concludes that the Defendant violated Section 404(a)(1)(B) by failing to exercise his duty of prudence.

Taken as a whole, the record shows that there is no genuine issue of material fact as to whether the Defendant violated ERISA Section 406(a). This section generally prohibits transactions between a plan and a party in interest. 29 U.S.C. § 1106(a). *See* p. 88, *supra.*

Here, the record shows, among other things, that the Defendant was a party in interest under ERISA because he was a fiduciary of the Plan. 29 U.S.C. § 1002(14)(A). *See* pp. 80–86, *supra.* Fidelity was also a "party in interest" under ERISA both because it provided services to the Plan and because it was a fiduciary of the Plan, as indicated in the Administrative Services Agreements. 29 U.S.C. §§ 1002(14)(A), (B). *See* p. 84, *supra.* NABOP was also a "party in interest" under ERISA because it was wholly owned by Rhue, a Plan trustee. 29 U.S.C. § 1102(14)(G) (*including* as a "party in interest" a "corporation, partnership, or trust or estate of which (or in which) 50 percent or more of [the interest] is owned, directly or indirectly, or held by [a fiduciary]."). *See* p. 84, *supra.*

The record further shows that the Defendant authorized the payments of NABOP and IWG fees as well as NABOP expenses with Plan assets, and that NABOP then paid both the Defendant and the Defendant's wife substantial sums in 1997. *See* p. 89, *supra.* The record also shows that the Plan paid Fidelity excessive fees, and that those sums were used by the Defendant and Samuels for their personal benefit when they wrote checks for personal financial planning on Fidelity's operating account. The record shows that these transactions transferred Plan assets away from their intended use and created a backlog of unpaid medical claims. The record also shows that the Audit Report indicated that related party transactions prohibited by ERISA may have taken place. *See* p. 91, *supra.*

By authorizing the payment of NABOP's expenses and fees with the Plan's funds rather than the payment of medical claims, the Defendant caused the Plan to engage in a transaction that constituted a "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan," as prohibited by ERISA Section 406(a). 29 U.S.C. § 1106(a)(1)(D). Similarly, by permitting an overpayment of Fidelity's fees from Plan assets, the Defendant violated ERISA Section 406(a) because the payment created a transfer of Plan assets to a party in interest, Fidelity. The Defendant's writing of checks on Fidelity's account for use in his own financial planning similarly constituted a transfer for the benefit of a party in interest. Based on the entire record, the Court concludes that the Defendant violated Section 406(a) by engaging in prohibited transactions.

Taken as a whole, the record shows that there is no genuine issue of material fact as to whether the Defendant violated ERISA Section 406(b). This section gen-

---

erally prohibits self-dealing by fiduciaries. 29 U.S.C. § 1106(b). *See* p. 88, *supra.*

Here, the record shows that Fidelity charged excessive fees to the Plan when it received almost thirty percent of Plan revenues, double the industry norm, in fees from January 1997 until August 1998. As president and fifty-percent owner of Fidelity, the Defendant obtained the benefits of these excessive fees and additionally, as the record shows, diverted Plan assets for his personal benefit. *See* p. 91, *supra.*

By engaging in these transactions, the Defendant dealt with Plan assets for "his own interest [and] for his own account," and this behavior constituted a violation of ERISA Section 406(b). 29 U.S.C. § 1106(b)(1). Based on the entire record, the Court concludes that the Defendant violated Section 406(b) by engaging in self-dealing.

For these reasons, the Court finds that the Consent Judgment Debt arose from defalcations committed by the Defendant in a fiduciary capacity, and thus the third element of a nondischargeability action under Section 523(a)(4) is met.

### *Conclusion*

In order to prevail on an action under Section 523(a)(4) of the Bankruptcy Code, the Secretary must prove that the Consent Judgment Debt arose in connection with an express or technical trust, that the Debtor acted in a fiduciary capacity with respect to the trust, and that the debt arose from defalcations within the meaning of the Bankruptcy Code. On this Motion for Summary Judgment, the Secretary has established that there is no genuine issue of material fact as to each of these elements, and that she is entitled to a declaration that the Consent Judgment Debt is nondischargeable under Section 523(a)(4)

of the Bankruptcy Code. An Order in accordance with this Memorandum Decision shall be entered simultaneously herewith.